PIERCE (WILSON v.). See Case No. 17,-826.

---

## Case No. 11,150.

### PIERCE v. WINSOR et al.

[2 Cliff. 18; 2 Am. Law Reg. (N. S.) 139.]

Circuit Court, D. Massachusetts.   Oct. Term, 1861.[1]

SHIPPING—DANGEROUS ARTICLES OF COMMERCE—DAMAGE TO CARGO—INEVITABLE ACCIDENT—LOSS.

1. Where damage is sustained in a case not falling within the category of an inevitable accident, and neither party is in actual fault, the loss must fall on him who, from the relation he bears to the transaction, is supposed to be possessed of the necessary knowledge to have avoided the difficulty.

[Cited in Parrott v. Barney, Case No. 10,773.]

2. Respondents chartered a vessel. and put her up as a general ship. Among other freight was an article new in commerce, and which was so affected by the voyage that it injured other parts of the cargo in contact with it, and involved an increased expenditure in discharging. The dangerous character of the article was unknown either to the shippers or the owners. and no actual fault was imputed to either. *Held*, that the damage and expenses occasioned by the peculiar character of the article must be borne by the shippers.

[Cited in Parrott v. Barney, Case No. 10,773; Mainwaring v. The Carrie Delap, 1 Fed. 878; The T. A. Goddard, 12 Fed. 179.]

[Appeal from the district court of the United States for the district of Massachusetts.]

This was an admiralty appeal. The respondents [Nathaniel Winsor and others] chartered of the libellant [Henry A. Pierce] the ship Golden City, for a voyage to San Francisco, and then put her up as a general ship. A quantity of mastic was shipped as freight by the United States government from their works in New York to the fort at Fort Point, San Francisco. The mastic was in casks, and was stowed in bulk in the run. Upon the arrival of the ship out it was found that the mastic had run together and among the cargo next to it, and had then hardened in a solid mass, adhering to the sides of the ship and the other adjacent portions of the cargo. The damage done to the rest of the cargo, which was paid by the master on account of the ship, and the extra expense in breaking out the mastic with drills and

---

[1] [Affirming Case No. 11,151.]

chisels, amounted to $1,900. Two other ships, the Dashaway and Fleetwing, which sailed shortly after the Golden City, had also some mastic, shipped in the same way, which arrived out in the same condition. These cargoes, with one shipped in casks, after the news of the state in which the earlier cargoes had arrived out had been received, were all the cargoes ever shipped by the United States, or, so far as known, by anybody, to San Francisco, or on any long voyage. The article was manufactured by the United States government at New York, and is used on fortifications, and had been repeatedly shipped to the various forts on our Atlantic coast and in the Gulf, and had always been shipped in bulk, without giving any indications that the heat in the hold of a vessel would, under any circumstances, affect it.

The suit was brought by the owner of the ship against the charterers, to recover the damages sustained by him in payment to other shippers for injury to their goods, and for extra expense in discharging. Mastic was then a new article in commerce. It was not pretended that the defendants had any knowledge of the dangerous character of this article, and, so far as anything was known of the article, it was thought perfectly safe to ship it in this way. The libellant claimed to recover upon the ground that there is always an implied contract on the part of the charterer or general shipper of goods that the goods shipped shall not be of a character dangerous to the ship and the residue of the cargo, and that the want of knowledge of the true character of the goods will not release such charterer or shipper of the goods from this responsibility. A decree was entered in the district court in favor of the libellant for money paid by him for other goods damaged, and for the extra expense in taking out the mastic. [Case No. 11,151.]

Sidney Bartlett and D. Thaxter, for libellant.

The case discloses the charter of libellant's ship by the respondents for a voyage from Boston to San Francisco, and an agreement of libellant that "the whole of said vessel shall be at the sole use and disposal of respondents during the voyage," and to "take and receive on board said vessel all such lawful goods and merchandise as respondents may think proper to ship." It further shows that an article called mastic, comparatively new to commerce, was laden on board the ship by the respondents. It may be assumed that the effect of the hot weather of the tropics during a voyage of the length and character of that in question was unknown to either party, and even to the manufacturer of the article (the government), since the mode of transport in cakes was changed to packing in barrels, after the result of this and two other contemporaneous voyages of the same character became known. The effect of this shipment upon other cargo for which the master had given bills of lading, and upon the ship herself, is undisputed.

The single question thus raised is, upon whom is the loss thus occasioned to fall, whether upon the owner who has thus put his ship "at the sole use and disposal" of the charterer, or upon the party having that sole use and disposal? Treated as the case of a general ship put up for freight, the case seems to have been decided by Brass v. Maitland, 6 El. & Bl. 470. Lord Campbell states the principle thus: "When the owners of a general ship undertake that they will receive goods and safely carry them and deliver them at the destined port, I am of opinion that the shippers undertake that they will not deliver to be carried on the voyage packages of goods of a dangerous nature, which those employed on behalf of the ship-owner may not on inspection be reasonably expected to know to be of a dangerous nature, without expressly giving notice that they are of a dangerous nature." Page 481. Again: "Although those employed on behalf of the ship-owner have no reasonable means, during the loading of a general ship, to ascertain the quality of the goods offered for shipment, or narrowly to examine the sufficiency of the packing of the goods, the shippers have such means, and it seems much more just and expedient that, although they were ignorant of the dangerous quality of the goods, or the insufficiency of the packing, the loss occasioned thereby should be cast upon the shipper than upon the ship-owners." Page 483. Again: "The defendants, and not the plaintiffs, must suffer, if from the ignorance of the defendants a notice was not given to the plaintiffs, which the plaintiffs were entitled to receive, and from the want of notice a loss has arisen which must fall either on plaintiffs or defendants." Page 486.

The soundness of this decision will be apparent, when it is considered that here is a loss which must fall upon one of two parties, and which cannot be classed with cases of mere misfortune, where neither party is in fault, and where the loss must rest where it happens to fall; for such a rule, applied to this case, would be equivalent to deciding that the loss must, in all cases, fall upon the ship-owner; or, to truly carry out such doctrine, the loss must, as to goods, be borne by the shipper whose goods are injured by the dangerous article stowed with them. The principle on which the rule in Brass v. Maitland rests is founded on well-settled analogies, derived from commercial law, which principle is this: Although, in a given case, neither the shipper nor the owner can, by inquiry, find or know the dangerous character of the article shipped, yet the law, which deals with general rules, and not with special cases, fixes the liability upon the shipper, because, under ordinary circumstances, he is best able to make the investigation and know the facts, and because this rule will best protect the innocent ship-owner from

experiments or frauds by the shipper, which are difficult of discovery and proof. The most striking analogy in support of this principle is drawn from the law of insurance, by which the owner of a ship has forced upon him the agreement that she is seaworthy, although there be latent defects which he could not discover; and this rests upon the ground that, in a great majority of instances, he may know the facts. Baron Parke states it thus (Gibson v. Small, 24 Eng. Law & Eq. 40): "Hence, the usual course being that the assured can and may secure the sea-worthiness of the ship, it is by no means unreasonable to imply such a contract in a policy in a ship on a voyage, and so the law most clearly has implied it. It may happen, indeed, in some cases, that from want of proper materials, of skilful artisans, of proper docks in the port of outfit, of sufficient funds or credit, or from the hidden nature of the defects, the owner may not be able to fulfil the duty of making the ship seaworthy at the commencement of the voyage; but the law cannot regard the exceptional cases ad ea quæ frequentius accidunt jura adaptantur; and it wisely, therefore, lays down a general rule, which is a most reasonable one in the vast majority of voyage policies." The case of this charter is stronger than that of a general ship, for there the owner retains some control over shipments. Here that control passed into the hands of the charterers. It was their duty to make inquiries if any were necessary. If, by reason of goods shipped by their authority, the owners of the ship suffer, they ought to make it good, whether they were in fault or not.

A. A. Ranney, for respondents.

The respondents had a right to ship the mastic under the charter-party. Libellant was bound "to take and receive on board all such lawful goods and merchandise as the respondents or their agents might think proper to ship." Mastic was a lawful shipment certainly. The ship was put up as a general ship, and was so chartered and intended. This would not exclude goods even which come within the class designated dangerous, although it might impose obligations for the exercise of greater care in some cases. It is respectfully submitted, therefore, that respondents are not liable on this ground. Respondents were perfectly innocent in the premises, and guilty of no negligence whatever. It is urged that there was an implied warranty on the part of respondents, that the mastic was fit to be shipped to San Francisco. To which they answer:—No such warranty is set forth in the libel, and this ground is not open to libellant. No such warranty existed under the circumstances. Courts have been inclined, of late, to restrict rather than extend this doctrine of implied warranty, and with reason; for it imposes obligations of a most serious na-

ture, under a contract which the parties never understood nor ever dreamed they were making. Dutton v. Gerrish, 9 Cush. 89; Chanter v. Hopkins, 4 Mees. & W. 399; Whitmore v. South Boston Iron Co., 2 Allen, 52; Morley v. Attenborough, 3 Exch. 500. It has never been extended to, or applied in, a case like this. The contract in this case as between the shipowner and respondents was in writing, and the written contract must govern. It is not competent to add to or vary or explain it, by parol or any such implication of law. Chanter v. Hopkins, 4 Mees. & W. 399; Randall v. Rhoades [Case No. 11,556]; Dickson v. Zizinia, 2 Eng. Law & Eq. 314; 3 Greenl. Ev. § 421, note 3; Gibbon v. Young, 2 Moore, 224; Johnson v. Miln, 14 Wend. 195. The proposition must go to the extent, that there was an absolute warranty, without qualification, that the goods were fit for shipment on the voyage, and that they were not dangerous even in any extraordinary degree of heat to be apprehended as possible in the hold on the voyage.

The counsel rely on Brass v. Maitland, 6 El. & Bl. 470, as an authority for their doctrine. This is perhaps the only case which seems to sanction such a principle. Lord Campbell, C. J., in giving his opinion (page 481), says: "I am of opinion that the shippers undertake that they will not deliver to be carried in the voyage packages or goods of a dangerous nature, which those employed on behalf of the ship-owner may not on inspection be reasonably expected to know to be of a dangerous nature." Again (page 483): "Although those employed on behalf of the ship-owner have no reasonable means, during the loading of a general ship, to ascertain the quality of the goods offered for shipment, or narrowly to examine the sufficiency of the packing of goods, the shippers have such means," &c. Wightman, J., concurred in the opinion. Crompton, J., combatted the doctrine laid down by the other judges in giving the opinion, contending that the implied undertaking of the shipper did not extend beyond the obligation to take proper care not to deliver dangerous goods without notice. Now, that case is clearly distinguishable from the case at bar, and when closely scrutinized is no authority for the libellant. The doctrine there laid down must be much extended and perverted to meet this case. That case was discussed entirely upon questions raised on the pleadings, which is never quite so satisfactory as when the questions arise on a full statement of facts in the development of the case, which a trial presents. The exact case decided is alone a competent authority, and the language of the court used in discussing the matter must be distinguished from the thing decided. In that case the first count in the declaration alleged that defendants knew that the bleaching-powder shipped was composed of chloride of lime, and was dangerous, and defendants in the third plea do not traverse this averment. Besides, the powder was well known to be dangerous,

and to require safe packing. It might properly be claimed that the shipper with such knowledge was bound to see that it was suitably packed when shipped. The only excuse offered was that defendants procured the article of other parties who furnished it upon their order, and neither knew or had reason to believe it was not suitably packed. Now this was no excuse, perhaps, for the defendants were bound, knowing the dangerous nature of the article, to see to it that it was shipped in proper condition, and the third parties of whom it was ordered stood only in the light of agents of the defendants, there being no relation or privity between these and the ship-owner. Campbell, C. J., 6 El. & Bl. 485. The defendants were without fraud, but not without fault, having violated a duty imposed upon them in regard to packing. The powder was concealed by being in barrels, and the ship and its agents did not know what was in them, and had no opportunity to judge of their safety or otherwise. The name of "bleaching-powder" did not indicate or disclose the existence of chloride of lime, a well-known dangerous substance. It was virtually a deception, although not so intended. The suit was between the ship-owner and the shipper.

In the case at bar the facts are entirely otherwise in every one of these respects. The defendants did not know, and could not know, that there was any danger. No one knew it, but everybody, or those who knew most about it, believed, and had the best reason to believe, the contrary thereof. The article was shipped under the name of "mastic," which indicated the general nature. It was uncovered and open to inspection. It was seen and examined by the master and owner. The former actually made full inquiry of the United States engineers and others, and satisfied himself on the very points where the danger arose, which was then suspected by him. The respondents are the charterers of the ship, not the shippers of the goods. It is a contract of affreightment, where the ship-owner victuals, mans, and navigates the ship, and is to load, discharge, and run the ship at his expense. The bill of lading runs from the ship to the shippers, making thereby a contract between them, and raising all the obligations expressed and implied between them. The ship has a lien on the cargo for freight, and the shipper can sue or libel the ship on the bill of lading, and hold it to the usual obligations arising in such a relation. The respondents are to pay a round sum as freight, and are to have all the ship makes in freight above that sum. They act rather as agents for the ship in getting the cargo, and the contract of the ship is merely a covenant that, as a compensation for their labor and risk, they shall have all the money received as freight above a specified sum. Such a relation is entirely different from that of a shipper and ship-owner. Drinkwater v. The Spartan [Case No. 4,085]; Paul v. Birch, 2 Atk. 621; Holt. Shipp. 471; Christie v. Lewis, 2 Brod. & B. 410; Faith v. East India Co., 4 Barn. & Ald. 630; 3 Greenl. Ev. § 421, and notes. The respondents were not only without fraud, but without fault. They acted with the utmost possible care and skill. The ship-owner and his master could not have been deceived and misled. They saw, examined, and inquired, and, relying on their own judgment and the information gained on inquiry, accepted and carried the goods without protest or objection. Respondents were not responsible for the wrong information they received. There could be no warranty implied under such circumstances. Such an undertaking is never implied only where, from what is done and said, the court can say that one party so agreed, and the other party so understood, and relied upon it. The mastic was required and taken as ballast, not under the usual obligations of a regular cargo. It was shipped in the usual way, just as all had shipped it, and others were willing to take and carry it again.

Brass v. Maitland [supra] was a case of insufficient and improper packing only, and the shippers violated a duty in this regard, that is all. The right to ship the powder was not denied. And here respondents had a right to engage the mastic, and it is too much to require them to be held responsible for the packing of the goods which merchants might send to the ship. The master and stevedore, the agents of the ship, were the proper parties to look to this, and the ship could and must hold the merchants to their responsibility about the packing. The privity of contract was between the ship and the shipper in this regard, not between the ship and the charterer. It cannot be said that there are two implied contracts of this kind.

Again: Suppose that there is a new article of commerce which neither shippers nor ship-owners know to be dangerous, is the innocent shipper to be liable? Lord Ellenborough's dictum, in Williams v. East India Co., 3 East, 192, would tend to show that knowledge of the party shipping is an essential ingredient. Mastic, being new to commerce, is just the case where it was assumed that the shipper would not be liable. But being known to be new to commerce, and accepted as such without objection, when it was seen and examined by all parties, this was notice sufficient, and takes the case out of the principle laid down in Abbott, and throws the risk on the ship-owner. This is equivalent to giving notice to, or knowledge on the part of, the master, the effect of which was decided in Brass v. Maitland, 6 El. & Bl. 485. If liable at all, respondents are not liable to reimburse the libellant for what he paid out to make good the damage occasioned to other goods; nor to pay for the other damages claimed. The mastic was shipped in a general ship, in the usual way, and the ship was not liable. Clark v. Barnwell, 12 How. [53 U. S.] 272; Lamb v. Parkman [Case No. 8,020]; Baxter v. Leland [Id. 1,125]; Abb. Shipp. 348. The ship paid the damages without suit and voluntarily, giving the respondents no opportunity to defend the claims

preferred, if any. It does not appear that anybody claimed the damages. Neither does it appear that the ship was liable. Whether the ship gave bills of lading in these cases does not appear in evidence.

CLIFFORD, Circuit Justice. [2] [This is an appeal in admiralty from the decree of the district court of the United States for this district, in a cause of contract, civil and maritime. The libellant was the owner of the ship Golden City, and the respondents were the charterers for a voyage from Boston to San Francisco. Charter-party bears date on the 4th day of May, 1858, and the libel was filed on the 10th day of November, 1859. The respondents chartered the whole ship, with the usual exceptions of the cabin and necessary room for the accommodation of the crew and stowage of the sails, cables, and provisions; and the stipulation was that the ship should be at the sole use and disposal of her charterers for the voyage, and that no goods or merchandise should be laden on board otherwise than from the charterers or their agent. The owners engaged to make necessary repairs, man, and victual the ship, and take and receive on board the vessel during the voyage all such lawful goods and merchandise as the charterers or their agent might think proper to ship. Among other things the libellant alleged that the respondents, as the charterers of the ship, while she was lying at New York, delivered or caused to be delivered on board the ship to the master, to be carried to Boston, and thence to San Francisco, on the voyage under the charter-party, one thousand and four cakes of an article called mastic; that the article is composed of bitumen and earthy matter, and at a certain degree of heat will soften and melt, and will then set so as to become very hard and flinty; that on a voyage such as that from Boston to San Francisco, the tendency on that behalf is so great that, unless the article is properly and skilfully packed, the cakes are liable to melt and run together, and among the other goods stowed in contact with the same, and to diffuse itself in the hold of the ship, and then to set and harden so as to injure and destroy the other goods, and to cause great and unusual expense in discharging the other goods and the mastic out of the ship; that the article was then new in commerce, and that the effect of a voyage upon it was unknown to the master and to the libellant; that the respondents did not give to the master or to the libellant any notice of the character of the article or of its liability or tendency to melt and do damage as aforesaid, and that neither the master nor himself had any knowledge or means of knowledge upon the subject, or that the mastic might not properly be stowed in the way that goods are usually stowed for such voyages; and he also alleged that the mastic did

[2] [From 2 Am. Law Reg. (N. S.) 139.]

soften and melt on the voyage, and that the cakes did run together and among the other goods placed in contact with the mastic, diffusing itself in the hold of the ship, and did then set and become hard and flinty, whereby the goods were injured and destroyed, and the libellant was compelled under the bills of lading to make good the loss and damage, and was put to additional expense in discharging the goods and freeing the ship of the mastic.

[Most of the material allegations of the libel are denied in the answer. The respondents deny that the mastic was a new article of commerce, or that they were bound to ascertain any further respecting the mastic, or give any notice to the libellant as to its character or the manner in which it should be stowed, or that they were in that particular or in any other respect at fault in the premises, as alleged by the libellant. Lawful goods and merchandise they had a right to ship; and they allege that the mastic was such under the charter-party, and that they shipped the same without any fault, and that the same was received by the consignees, paying freight on the same, and that the mastic was put to the purposes for which it was designed, and consequently they allege that if the libellant was put to any expense or suffered any damage, it was through his own fault, and that of his agents. Both parties took testimony in the district court, and, after the hearing, the court entered a decree in favor of the libellant, and the respondents appealed to this court. The mastic, as alleged, was shipped by the government of the United States from their works at New York to the fortification at Fort Point at San Francisco. When delivered on board it was in cakes, and was stowed in bulk in the run. Upon the arrival of the ship at the port of destination, it was found that the mastic had melted on the voyage, and that the cakes had run together and among the cargo stowed in contact with it, and had hardened as alleged in the libel, and in that state was adhering to the sides of the ship and to certain portions of the cargo. The amount of damage done to the cargo, which was paid by the master on account of the ship, including the extra expense in discharging the mastic, exceeded nineteen hundred dollars. Two other ships, the Dashaway and the Fleetwing, which sailed shortly after the Golden City, also had mastic on board, shipped in the same way, and the proofs show that when the vessels arrived out it was in the same condition. These cargoes, with one shipped in casks at a later period, and after the facts respecting the earlier shipments had become known, were all the cargoes, so far as known, ever shipped by the United States to San Francisco, or on any long voyage. Such mastic is manufactured by the government at New York, and is used on fortifications, and has been repeatedly shipped to the various forts on the Atlantic coast and in the Gulf, and had always been

shipped in bulk without its being known that it was liable to be so affected by the heat in the hold of the vessel. Suit is brought by the owners of the vessel against the charterers to recover the damage and expense as already explained. The libellant does not allege or prove that the respondent had any knowledge of the dangerous character of the article, but he claims to recover upon the ground that there is always an implied contract on the part of the charterer or general shipper of the merchandise that the goods shipped shall not be of a character dangerous to the ship or the rest of the cargo, and that the want of knowledge of the true character of the article will not release such charterer or shipper from the responsibility which the law imposes upon him as incidental to his contract.] [2]

Two propositions may be assumed as beyond dispute: first, that the case is not one of inevitable accident; and, secondly, that the owner of the ship is without any actual fault arising out of any act of his own, or that of the master or his agents. Inevitable accident is not pretended, and if the pretence were set up, it could not be supported for a moment. Union S. S. Co. v. New York & Virginia S. S. Co., 24 How. [65 U. S.] 313.

Some attempt was made to impute fault to the owner of the vessel, because she was delayed in Boston for the purpose of repairs, but the explanations are satisfactory, and the position wholly unsupported.

Neither party had any knowledge of the dangerous character of the article, so that it may be said that there was no actual fault on either side, except such, if any, as the law implies from the nature of the transaction. The charterers put up the ship as a general ship, and under the terms of the charter-party the ship was at their sole use and disposal, to ship such lawful goods as they might think proper; and it was expressly stipulated that their stevedore should be employed by the owner, in Boston. The stowage of the mastic was made in the usual way, and it is not disputed it would have been proper, if the article had been what it was supposed to be when it was received and laden on board. Want of greater care in that behalf is not a fault, because the master had no knowledge or means of knowledge that the article required any extra care or attention beyond what is usual in respect to other goods. The proper precautions in respect to loss in the vessel, therefore, had been taken, if the goods had not been of a dangerous character, which was wholly unknown to the master or the owner of the ship, or his agents. But damage was occasioned, and loss and expense were incurred, and the only question is, Who must suffer? Where the owners of a general ship undertook that they would receive the goods, and safely carry and deliver them at

2 [From 2 Am. Law Reg. (N. S.) 139.]

the destined port, it was held in Brass v. Maitland, 6 El. & Bl. 481, that the shippers undertook that they would not deliver to be carried on the voyage packages of goods of a dangerous nature, which those employed on behalf of the ship-owner might not, on inspection, be reasonably expected to know to be of a dangerous nature, without expressly giving notice that they were of a dangerous nature. Such was the principle laid down in that case, but the reasoning of the court in support of the rule is even more applicable to the present case. Although those employed on behalf of the ship-owner have no reasonable means, during the loading of a general ship, to ascertain the quality of the goods offered for shipment, or narrowly to examine the sufficiency of the packing of the goods, the shippers, says Lord Campbell, have such means, and it seems more just and expedient that, although they were ignorant of the dangerous quality of the goods, or the insufficiency of the packing, the loss occasioned thereby should fall upon the shippers than upon the ship-owner. Accordingly, he held that the shippers, and not the ship-owners, must suffer, if, from the ignorance of the former, a notice was not given to the latter, which they were entitled to receive, and from the want of notice a loss had arisen, which must fall on either the shipper or the owner of the vessel. .

Undoubtedly that rule, as is well contended by the libellant, rests upon the same principle as that which is applied in other commercial transactions of an analogous character. Where damage is sustained in a case not falling within the category of an inevitable accident, and neither party is in actual fault, the loss shall fall on him who, from the relation he bears to the transaction, is supposed to be possessed of the necessary knowledge to have avoided the difficulty. Baron Parke applied that rule in the case of Gibson v. Small, 24 Eng. Law & Eq. 40, with great force and vigor, in the case of a voyage policy, holding that the law did not regard exceptional cases, but wisely laid down a general rule, which is a most reasonable one in the vast majority of voyage policies, that the assured impliedly contracts to do that which he ought to do before the commencement of the voyage. Judge Sprague approved the rule, upon the ground that it ordained that the loss should fall upon the party who generally had the best means of informing himself as to the condition of the article to be shipped, which undoubtedly is the foundation principle on which the liability rests.

Were the rule otherwise, it might, as was well said by the district judge, encourage negligence, and even induce the general shipper or charterer to try experiments with articles unknown to commerce, at the expense of his ship-owner. In view of the whole case, I am of the opinion that there is no error in the record. The decree of the district court is accordingly affirmed, with costs.