## THE WM. J. QUILLAN.

(District Court, S. D. New York. January 20, 1910.)

*(Syllabus by the Judge.)*

SHIPPING (§ 193*)—GENERAL AVERAGE.

Loss by fire in a vessel arising from garbage tankage shipped at Barren Island, New York. *Held*, that the goods were dangerous and though it did not explicitly appear how the fire arose, it should be attributed to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the tankage and the underwriter of the shipper was not entitled to recover a general average contribution from the vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 609; Dec. Dig. § 193.*

General average, see notes to Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316.]

Action by the Atlantic Mutual Insurance Company against the schooner Wm. J. Quillan. Libel dismissed.

See, also, 168 Fed. 407.

Carter, Ledyard & Milburn, for libellant.

Horace L. Cheyney, for claimant.

ADAMS, District Judge. The libel alleges that on or about the 13th of January, 1906, the schooner Wm. J. Quillan sailed from Barren Island for Savannah, having on board a cargo of garbage tankage in bags, the property of Heller, Hirsh & Company, the shippers thereof, who were insured with the libellant in the sum of $6,685, which was the fair and reasonable value thereof; that while the schooner was proceeding on her voyage, on or about January 14, 1906, it was discovered that some of the bags of the cargo were on fire and the vessel bore away for Norfolk, Virginia, and arrived at Portsmouth, Virginia, on or prior to January 15th; that prior to the arrival of the schooner at Portsmouth and for the purpose of extinguishing the fire and saving the cargo, vessel and freight, water was introduced into the hold of the vessel under the orders and direction of the master, so that eventually the entire cargo and the bags were flooded with water by which means the fire was extinguished and the vessel saved; that of the cargo only 954 bags were damaged by fire and all the residue, the contents of 13,561 bags and the bags containing the same were not on fire and were damaged only by water used in extinguishing the fire; that the cargo was in such condition that it could not be carried to its destination and was sold at Portsmouth; that the libellant thereafter paid to Heller, Hirsh & Company $6,321.01, the insured value thereof, after deducting therefrom the net proceeds received by Heller, Hirsh & Company from the sale thereof; that the sound value of the 13,561 bags and their contents damaged only by water was $6,157.07 and the net proceeds of the sale did not exceed $443, and the amount of the value sacrificed exceeded $5,714.07. The libel further alleges that by reason of the premises a case for contribution in general average arose, and the obligation rested upon the Quillan to cause a general average statement to be prepared and to furnish to the adjusters employed to make such adjustment all information within the possession of the master, officers and owners of the schooner necessary for a true and correct adjustment of the contribution payable on account of the value of the cargo sacrificed; that Heller, Hirsh & Company and the libellant have been ready and offered to furnish all information in the possession of either of them requisite for a full and complete statement in general average and furnished such information to Cunningham, Coale & Company of Baltimore, Maryland, adjusters heretofore designated

by the said schooner as the adjusters to prepare such statement, but the schooner, her officers and owners have failed to furnish the requisite information to enable the adjusters to prepare such a statement; that the libellant is unable to state the exact amount it is entitled to receive but alleges that it is entitled to receive the amount payable by the schooner on account of the value of the cargo sacrificed, upwards of $4,750, with interest thereon from January 15, 1906, it therefore prays that process issue against the schooner and that a general average statement be prepared under the direction of the court and the schooner be condemned to pay the amount due to the libellant.

The answer admitted, in substance, the allegations of the libel except that it denied the quantities stated, averring that about 60 per cent. of the bags were on fire or damaged thereby. It denied that a case for contribution in general average arose because the fire was due to the inherent vice or quality of the tankage, raising the question whether a spontaneous combustion arising from such cause made resort to general average proper.

The answer also alleged:

"7. In further answer to the allegations of the said libel, the claimant avers that the said schooner had but one hold and that the said 14,515 bags of tankage constituted a full and complete cargo for said vessel; and that the said vessel during said voyage and at the time of said fire had no cargo on board except said 14,515 bags of tankage.

8. The claimant further avers that the said fire arose out of the spontaneous combustion of said tankage due to the inherent vice or quality thereof. The claimant avers that by reason thereof no case for contribution in general average arose as alleged in the said libel, and denies that the libellant is entitled to receive any contribution from the said vessel or from the owners thereof in general average on account of the damage to the said cargo or any part thereof arising from the introduction of water into the hold of said schooner for the purpose of extinguishing the said fire.

9. In further answer to said libel, the claimant avers that the said schooner was considerably damaged by the said fire and by the measures resorted to by the firemen for the purpose of extinguishing the said fire, as a result whereof the said schooner and the owners thereof sustained damage in the sum of $4,888.61, as follows:

Repairs to said schooner..................................... $1355.86
38 days demurrage at $57.60 per day.......................... 2188.80
Various expenses in attempting to extinguish said fire, pumping water out of the vessel, towages, etc........................ 1343.95
                                                              4888.61

The claimant of said schooner hereby claims the benefit of said sum of $4888.61, as a set-off against any liability on the part of said schooner or the owners thereof under the allegations of said libel, if any such liability exists which the claimant denies."

The libellant excepted to the answer and it was decided that upon the pleadings the libellant was entitled to succeed (see The Wm. J. Quillan, 168 Fed. 407), but in the decree the schooner was allowed time for an amended answer, and the following was filed:

"The claimant, in pursuance of leave given in interlocutory order entered 16th February, 1909, hereby amends his answer in the above cause by adding the following paragraph thereto, after paragraph 9:

10. The claimant avers upon information and belief that said cargo of tankage at the time it was loaded upon said Schooner at Barren Island, was not in fit and proper condition for shipment through the neglect and fault of

the shippers thereof in failing to have it properly cured and dried out, all of which was unknown to the claimant, and that the fire in said cargo was caused by the spontaneous combustion thereof due to its condition as aforesaid."

Thereafter testimony was taken by both sides under the amendment and the argument of the claimant now is, as appears from the brief, after describing the proceedings hereinbefore set forth:

"Subsequently the claimant amended his answer and alleged that the cargo of tankage, at the time it was loaded on board the schooner at Barren Island, was not in fit and proper condition for shipment, through the neglect and fault of the shippers thereof in failing to have it properly cured and dried out, all of which was unknown to the claimant, and that the fire in the cargo was caused by spontaneous combustion due to its condition as aforesaid."

It appears that garbage tankage is the product of ordinary city garbage, which is taken to Barren Island in scows and thrown into large vats where it is cooked under steam pressure so as to liberate or extract the grease, which in connection with the moisture, is pressed out of the tankage; then it is sent automatically on belts through drying machines into a warehouse where it is spread out to cool, and after it is cooled it is automatically sacked and put into a warehouse for the purpose of shipment. The result is the production of a dry powdery material.

If the tankage is properly prepared and manufactured, there is no danger of internal fire during any voyage it may be taken upon. Contact of the tankage with water in connection with lack of ventilation may cause a fire. But in this case the schooner was but two years old and was tight. The weather was clear when the cargo was loaded and the hatches put on. She encountered no severe weather on the voyage and it does not seem that any water could have gone from the outside into the hold. Soundings were regularly taken but no water found. The cargo was properly dunnaged. The fire was not in the bottom next to the dunnage but several feet above it and several feet from the hatches.

It has been said that the mate of the vessel was seen smoking a pipe during the time it was being loaded but it does not appear in what portion of the hold the mate was at the time nor were there any facts stated which would connect him with the fire. The mate denied that he was smoking there during the loading and there is no such preponderance of the testimony as would show that smoking on his part was the cause of the trouble.

The fire could be accounted for: (1) by an excessive quantity of oil or grease being left in the garbage during the process of manufacture, (2) by a failure to properly dry out the tankage after it had gone through the pressing process or the failure to extract the moisture from it, and (3) by the loading of the cargo upon the vessel too soon after it came out of the kilns and before it had thoroughly cooled.

The adoption of any of these theories would depend more or less upon conjecture, but it is evident that there was some defect in the goods which caused the fire.

Section 4282, p. 827, Rev. St. (U. S. Comp. St. 1901, p. 2943), has been referred to by the claimant. It provides:

"Sec. 4282. No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

It has, however, been explicitly held that this statute was designed to relieve the harshness of the common law with respect to ship owners' liability but does not exempt them from liability to contribute toward general average. The Roanoke, 59 Fed. 161, 8 C. C. A. 67, cited in Ralli v. Troop, 157 U. S. 386, 413, 15 Sup. Ct. 657, 39 L. Ed. 742.

The claimant cites the case of Pierce v. Winsor, 19 Fed. Cas. 646, where a vessel was put up as a general ship and among other cargo placed aboard was mastic, an article new in commerce but as it proved, dangerous to other cargo. The dangerous quality was, however, unknown either to the shippers or the vessel owners and no fault could be imputed to either. It was held that the damage and expenses occasioned by the peculiar character of the article must be borne by the shipper, the charterer, upon the ground that there is always an implied contract on the part of the shipper that the goods shipped shall not be of a character dangerous to the ship and the residue of the cargo and the want of knowledge would not release the shipper from responsibility to the owner. Apart from the present one being a general average case, this authority would seem to be conclusive in favor of the vessel. How then is the matter affected by the fact that this is a case of general average, because the tankage seems to have been the cause of the fire. Although it was not shown how it originated, it appears to be reasonably sure that the fire arose from the nature of the goods. No cause for the fire is shown but the tankage took fire in a part of the cargo not subject to ordinary accidents, that is, nothing extraneous could reach it.

I find nothing in the law of general average which would take this case out of the principles expressed in Pierce v. Winsor (and see Brass v. Maitland, 6 Ellis & Blackburn, 470) and it is not now clear to me that the Greenshields Case, depended upon for the decision in The Wm. J. Quillan, supra, should govern here. That covered coal, which the ship owner knew was liable to spontaneous combustion, while the tankage here was a manufactured product, which was dangerous if proper care was not taken in the production, but of that the vessel's representatives knew nothing. The testimony shows that the latter can be made so as to be perfectly safe but it was not so made here and no doubt caused the fire, though how has not been made to appear. It would be inequitable to permit the libellant to recover from the vessel damages which resulted from its own fault in shipping a dangerous article.

The libel is dismissed.