## THE WM. J. QUILLAN.

(Circuit Court of Appeals, Second Circuit. July 6, 1910.)

No. 313.

1. SHIPPING (§ 190*)—GENERAL AVERAGE—DAMAGE TO CARGO—LIABILITY OF VESSEL TO CONTRIBUTE—DAMAGE RESULTING FROM CONCEALED DEFECT IN CARGO.

A shipper is not deprived by the maritime law of the benefit of contribution in general average when the peril is caused by a concealed defect in his shipment equally unknown to him and to the shipowner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 602; Dec. Dig. § 190.*

General average see notes to Pacific Mail S. S. Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316.]

2. SHIPPING (§ 190*)—GENERAL AVERAGE—LIABILITY OF SHIP TO CONTRIBUTE TO CARGO LOSS—"TANKAGE."

A schooner was chartered to carry a cargo of garbage tankage, which is a dry powder, the result of the boiling, drying, and pressing of street garbage, and is packed in bags. Owing to the failure of the manufacturer to properly cure and dry out the tankage, the cargo took fire from spontaneous combustion, and the hold was flooded to put out the fire causing damage to the remainder of the cargo not burned. The shipper purchased the tankage from the manufacturer, and had nothing to do with its loading or stowage, and no knowledge that it was not in proper condition, but it was a well-known article of commerce and both shipper and shipowner knew its character. Held, that the shipper or his insurer which paid the loss was entitled to recover from the vessel its contribution in general average to the loss caused by the water damage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 602; Dec. Dig. § 190.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Atlantic Mutual Insurance Company against the schooner William J. Quillan. Decree for respondent (175 Fed. 207), and libelant appeals. Reversed.

C. I. Taylor and Carter, Ledyard & Milburn (Edmund L. Baylies and Edwin D. Bechtel, of counsel), for appellant.

A. D. Foster and H. L. Cheyney, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. November 25, 1905, Heller, Hirsch & Co. chartered the schooner William J. Quillan to carry a cargo of tankage from Barren Island, N. Y., to Savannah, Ga. Tankage is a dry powder, the result of the boiling, drying, and pressing of street garbage, and is packed in bags. Heller, Hirsch & Co. bought the tankage from the manufacturer, and had themselves nothing to do with the making, bagging, or stowing of the same. It has been the subject of transportation for 25 or 30 years, and shippers and shipowners must be taken to have knowledge of its character.

Saturday, January 13th, at about 8 a. m., the schooner sailed from Barren Island with a cargo consisting of 14,515 bags. On the morn-

ing of January 14th it was discovered that the cargo was on fire. Thereupon the master deviated to Norfolk as a harbor of refuge, arriving there at 7 p. m. Sunday evening. In the course of the next day or two the city fire engines at his request poured water into the hold and extinguished the fire. Nine hundred and fifty-four bags were found to have been damaged by fire and the remainder by the water used to extinguish the fire. The value of the water-damaged bags less the proceeds of sale was $5,714.07. The Atlantic Insurance Company, which as insurer of the cargo had paid the loss, filed this libel against the vessel, alleging that a statement of general average which it was the duty of the vessel owners to prepare would show the amount payable by the schooner on account of the cargo sacrificed by the water damage to be $4,750 or thereabouts. The claimant denied that the shipper was entitled to contribution in general average on the ground that the cargo was not in a fit and proper condition for shipment through the neglect and fault of the shippers in failing to have it properly cured and dried out, and that its spontaneous combustion caused the fire.

The actual cause of the fire was not proved, but the district judge assumed that it was due to the nature of the goods, and, following the case of Pierce v. Winsor, 2 Cliff. 18, Fed. Cas. No. 11,150, dismissed the libel on the ground that the shipper was liable for shipping dangerous cargo, although neither he nor the carrier knew of its dangerous condition. Many kinds of cargo are liable to spontaneous combustion when confined in the vessel's hold, if they contain too much moisture, e. g., jute, cotton, lime, coal, hay, and grain. We shall consider the case upon the same assumption of facts as did the district judge.

As there is no pretense that the fire was due to the fault either of the shipper or his servants, the question whether a shipowner, constructively negligent can be brought into a general average adjustment in view of the provisions of section 4282, Rev. St. U. S.,[1] limiting the liability of shipowners for damage caused by fire and of the Harter act, does not arise. We are accordingly relieved of the considerations which we lately discussed in the case of the steamship Jason, 178 Fed. 414.

The question to be determined is whether by the maritime law the shipper is deprived of the benefit of contribution in general average when the peril is caused by a concealed defect in his shipment equally unknown to him and to the shipowner. There is very little authority upon the subject, but it has been lately considered by the Court of Appeal and the House of Lords in the case of Greenshields v. Stephens, 1 King's Bench, 51 (1908), and Appeal Cases, 431 (1908). The fire in that case arose out of spontaneous combustion in a shipment of coal on the Knight of the Garter. Both courts affirmed the judgment of Channell, J., allowing contribution on the ground that the shipper could be deprived of the benefit of contribution in general average only when he has been guilty of actionable fault or negligence. Lord Chief Justice Alverstone and Lord Justices Bulkeley and Kennedy in the Court of Appeal and the Earl of Halsbury and Lords Ash-

[1] U. S. Comp. St. 1901, p. 2943.

bourne, Macnaghten, Collins, and James in the House of Lords were unanimously of this opinion. Mr. Justice Kennedy said at pages 61, 62, 1 King's Bench (1908):

"In the present case there is no actionable wrong. The courts of this country have never laid it down that the mere fact that the mischief arose out of the goods shipped by the person claiming general average deprived him of his right so to claim. There is no absolute warranty by the shipper of safety of carriage in cases where the goods shipped may be openly seen and are known by the shipowners to be by their nature possibly productive of danger. See Brass v. Maitland, and especially the judgment of Crompton, J. It was contended by Mr. Hill that, even though there be no liability to action on the part of cargo owners in such a case as the present, yet it is on moral grounds unreasonable and unfair that they should be entitled to claim in general average. For myself I cannot see what there is unreasonable or unfair in their so doing. As between themselves and the shipowner, they have merely shipped that which the shipowner knew he was taking on board with its liability to spontaneous combustion. So, too, with the other shippers— they either knew that the cargo other than their own was coal, or they did not choose to inquire, and, in either case, they took upon themselves the risk of damage arising from the coal's natural tendency to heat. The coal in this case was not exceptionally combustible, nor were the shippers guilty of any negligence in the shipping of it. Under those circumstances, it seems to me that there is nothing unfair or unreasonable in the shippers of the coal retaining their rights in common with others to a general average contribution in respect to such of their goods (not having been actually on fire) as have been sacrificed for the safety of the general adventure."

The conclusion arrived at by the highest courts of the greatest commercial nation in the world ought to have weight everywhere. We prefer to follow it, nothwithstanding that it may be inconsistent with the views expressed by Justice Clifford at circuit in Pierce v. Winsor, supra. In that case mastic, a new article of commerce, had been shipped on a general ship from New York to San Francisco. On the voyage it melted and then solidified so that the shipowners were put to great expense to free it from the other cargo and from the ship. For this they sued the shippers and were allowed to recover. Mr. Justice Clifford said:

"Neither party had any knowledge of the dangerous character of the article, so that it may be said that there was no actual fault on either side, except such, if any, as the law implies from the nature of the transaction. The charterers put up the ship as a general ship, and under the terms of the charter party the ship was at their sole use and disposal to ship such lawful goods as they might think proper; and it was expressly stipulated that their stevedore should be employed by the owner in Boston. The stowage of the mastic was made in the usual way, and it is not disputed it would have been proper, if the article had been what it was supposed to be when it was received and laden on board. Want of greater care in that behalf is not a fault, because the master had no knowledge or means of knowledge that the article required any extra care or attention beyond what is usual in respect to other goods. The proper precautions in respect to loss in the vessel, therefore, had been taken, if the goods had not been of a dangerous character, which was wholly unknown to the master or the owner of the ship, or his agents. But damage was occasioned, and loss and expense were incurred, and the only question is, Who must suffer? Where the owners of a general ship undertook that they would receive the goods and safely carry and deliver them at the destined port, it was held in Brass v. Maitland, 6 El. & Bl. 481, that the shippers undertook that they would not deliver to be carried on the voyage packages of goods of a dangerous nature, which those

employed on behalf of the shipowner might not on inspection be reasonably expected to know to be of a dangerous nature, without expressly giving notice that they were of a dangerous nature. Such was the principle laid down in that case, but the reasoning of the court in support of the rule is even more applicable to the present case. Although those employed on behalf of the shipowner have no reasonable means, during the loading of a general ship, to ascertain the quality of the goods offered for shipment, or narrowly to examine the sufficiency of the packing of the goods, the shippers, says Lord Campbell, have such means, and it seems more just and expedient that although they were ignorant of the dangerous quality of the goods, or the insufficiency of the packing, the loss occasioned thereby should fall upon the shippers than upon the shipowner. Accordingly, he held that the shippers, and not the shipowners, must suffer, if, from the ignorance of the former, a notice was not given to the latter, which they were entitled to receive, and from the want of notice a loss had arisen, which must fall on either the shipper or the owner of the vessel."

We think an erroneous view was taken of the case of Brass v. Maitland, supra. If Mr. Justice Clifford's construction was right, it is strange that none of the distinguished judges commented on it in the Greenshields Case as inconsistent with the view there expressed. But we think the construction was erroneous. The first count in the declaration in Brass v. Maitland alleged that the complainants, the shippers, delivered to the defendants, the shipowners, a corrosive substance in casks which were insufficient, whereby the contents escaped and destroyed the cargo. To this the defendants pleaded that they purchased the goods ready packed from a third person, and were not themselves or by their servants guilty of negligence. A demurrer to this plea was sustained, Crompton, J., dissenting. Lord Campbell, C. J., said at page 485:

"The third plea, which is the first demurred to, and which is pleaded to so much of the first count as relates to the casks, I consider insufficient. Waiving the objection that it seeks to divide the dangerous quality of the goods and the insufficiency of the packing into separate and distinct causes of action, I think that it discloses no defense as to the insufficient packing; for it only denies that the defendants personally, or by their servants, packed the casks, and alleges that they employed Burnet & Sons to pack them, and that neither the defendants nor Burnet & Sons knew or believed, or had reason to know or believe, that the casks were not proper or sufficient. The first count is not in deceit, founded on any guilty knowledge. The allegation of the insufficiency of the casks, and of the dangerous nature of the goods, is not denied by the third plea. It follows that the ignorance of the defendants, and those employed by them, can be no excuse for putting on board without notice the dangerous goods insufficiently packed."

This does not show that the defendants would have been held liable if they had not known that the contents of the casks were dangerous. As Lord Justice Brett said in Acatos v. Burns, L. R. Exch. Div. (1877 to 1878), 282, 292:

"As to the question of warranty, neither Brass v. Maitland nor any other case shows that there is a warranty by the shipper that the goods shipped had no concealed defects at the time of shipment."

Counsel for the shipowner further contend that the obligations of contribution in general average being reciprocal, there must be implied an absolute warranty of the fitness of cargo as an offset to the

implied absolute warranty of the seaworthiness of the ship. But the latter is a well-known warranty constantly mentioned in the books. We think there is no such analogous warranty in the case of cargo. If there is, it has received scant recognition.

The decree is reversed, with costs.