## THE ENSLEY CITY.

### No. 2571.

District Court, D. Maryland.
March 27, 1947.

Lord & Whip, by George W. P. Whip, all of Baltimore, Md., for libellant.

Ober, Williams, Grimes & Stinson, by William A. Grimes, all of Baltimore, Md., for respondent.

WILLIAM C. COLEMAN, District Judge.

This is a suit for damage to a cargo of licorice extract alleged to have been caused by improper stowage, brought under the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315.

The material facts about which there is no dispute are, briefly stated, as follows: On May 20, 1942, the steamship Ensley City, owned by the Isthmian Steamship Company, respondent, loaded at Basra, Iraq, from open lighters, 732 cases and 319 bags of licorice extract which had been manufactured in Turkey and shipped by rail via Bagdad to Basra, arriving there in April, 1942, that is, about a month before it was loaded on the Ensley City.

This licorice extract was made from licorice root in hard, five pound blocks, but it retained its inherent characteristic of viscosity when subjected to high temperatures. Each block was wrapped in paper and packed in wooden boxes, twenty blocks to a case. These cases were of wood, about an inch thick, three feet long, eighteen inches wide and twelve inches high, being similar to the more substantial boxes in which oranges or other fruits are customarily packed and shipped. The blocks of extract completely filled each case, except for a space of about two inches which was left in order to allow for swelling due to heat, and to prevent spoiling. Each case bore the notation: "Stow away from boilers."

As the loading from the lighters was about to commence, the weather being very warm with a temperature of about 115° F., the master of the Ensley City, upon seeing that some of the cases were damaged and broken and the licorice extract was oozing out of them, refused, on instructions from the vessel's local agent, to allow the cargo to be loaded unless upon the condition of limited liability. Accordingly, the master required an endorsement on the bill of lading as follows, after carpenters, supplied by the shipper, had made certain repairs to the broken cases by using the ship's dunnage, and had cut off some of the licorice extract that had "escaped" from the cases and had placed it in bags: "Mate's Receipt states:

Of which 270 gunny bags licorice said to be the contents of the above 732 cases licorice. All cases badly broken smashed and repaired on board contents exposed and damaged ship n/r. for loose (loss) of contents damages and short of weight at delivery and all bags old and torn contents exposed n/r. for short of contents and weight."

The entire cargo of licorice extract was stowed in the forward part of No. 4 tweendecks, directly forward of which was the engine room, separated only by a bulkhead, to within six inches of which this cargo extended. Next to the engine room were the boilers, that is to say, they were about eighty feet distant from the forward bulkhead of the space where the licorice extract was stowed.

The second officer who was in charge of receiving and stowing the cargo required that one case be placed on top of another, criss-cross fashion, in tiers of eight or nine cases high, these tiers extending from the forward bulkhead of No. 4 tweendecks aft to the forward hatch-coaming. On top of these tiers of cases the bags were placed. The cargo thus extended from the floor of No. 4 tweendecks to within a foot or a foot and a half of that compartment's ceiling. The vessel's amidship-house covered substantially all of the deck that was above the licorice extract. No dunnage was used between the cases. Just aft of the after hatch-coaming in No. 4 tweendecks a steel bulkhead extended the width of the vessel, forming a compartment known as a strong room for the safekeeping of valuable articles. In the part of No. 4 tweendecks in which the licorice extract was stowed there were only two ventilators in the forward end of it, two other ventilators being shut off from this section of the tweendecks by the strong room. No. 4 hatch was kept open whenever the weather permitted.

The Ensley City left Basra May 25th and proceeded to Lourenco Marques, Portuguese East Africa, where she arrived on June 13th, and there took on chrome ore, some of which was loaded in the lower holds and some in No. 4 tweendecks next to the licorice extract, but two athwartship bulkheads were constructed in order to keep the two cargoes from coming in contact with each other. At Lourenco Marques nothing improper was noted about the condition of the licorice extract. No inspection of it was made after the vessel left Lourenco Marques until it reached Baltimore.

The Ensley City arrived in Baltimore about the middle of August, whereupon it was found that the licorice extract had broken out of most of the cases and bags when in a glutinous state and thereafter had become a hard mass, with many cases and bags stuck together, wood, nails and other foreign material from the broken cases and bags being imbedded in the licorice. This made it impossible to remove the cargo from the vessel, case by case and bag by bag, as it had been received and stowed at Basra, and it had to be broken by picks before it could be removed. Recovery is not sought for actual injury to the licorice extract, but for the extra expense rendered necessary in unloading it, as well as that involved in melting it down and removing the foreign material from it after it was discharged from the vessel so as to make it marketable, such cost being estimated at more than $20,000.

In the present case there is no claim by libellant that the Ensley City was unseaworthy, but that the cargo damage was due to improper stowage in that (1) the licorice extract should have been stowed in one of the lower holds, that is, below the water line; preferably in No. 1 hold, where, as libellant claims, the temperature was less than in No. 4 tweendecks, and (2) dunnage should have been used between the cases which would have furnished some additional circulation of air.

On the other hand, respondent's position is that (1) the licorice extract was not in good condition when loaded on the Ensley City, and (2) its stowage was entirely proper, and any change in its condition occurring during the voyage was due to inherent vice in the extract itself and to the inadequacy of the cases and bags in which it was delivered for shipment.

The applicable provisions of the Carriage of Goods by Sea Act are contained in the parts of Section 4 of the Act, 46 U.S.C.A. § 1304, as follows:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\*　　\*　　\*　　\*　　\*　　\*

"(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

"(n) Insufficiency of packing;

•\* \* \* \* \* \*

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

Respondent contends, relying upon The Niel Maersk, 2 Cir., 91 F.2d 932, certiorari denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, that since, as is seen from the aforegoing, the Act specifically exempts the carrier from loss due to insufficiency of packing—which embraces containers—and since it is well established that in a suit of this kind it is incumbent upon libellant to establish that the cargo was shipped in good order and condition, the libel must be dismissed because libellant has failed to meet this initial burden of proof.

There is no absolute obligation on a vessel to accept a cargo. Indeed, it should not be accepted unless it can be given the type of stowage that its character requires, and the placing of conditions in a bill of lading does not relieve the vessel of the obligation to take appropriate care of the cargo. The San Guglielmo, D.C., 241 F. 969; Doherr v. Houston, 2 Cir., 128 F. 594. But even though the cargo was improperly stowed, it is incumbent upon the present libellant to establish that the goods when delivered were in a different or worse condition from that when received by the vessel, and that such change was due to improper stowage, and not to some quality inherent in the goods themselves. The Niel Maersk, supra; The Nelson Traveler, 9 Cir., 95 F.2d 286; The Chester Valley, 5 Cir., 110 F.2d 592.

The position of the libellant may again be summarized as follows: He claims that the weight of the credible evidence proves that the excessive temperature during the first part of the voyage, in that part of the hold in which the cargo was stowed, caused it to soften and run, and that during the latter part of the voyage, when the temperature became considerably lower, because of the more temperate zone of travel, the extract hardened again. On the other hand, on behalf of the shipowners, it is contended that this cargo, being inherently a viscous material, that is glutinous and semi-fluid, had the characteristic of becoming soft in a temperature of 50° F. and of melting in a temperature of 105° F. and over; that it was in a semi-fluid state, due to the summer heat at Basra, when it was presented for loading on the Ensley City, and that after being loaded, and throughout the voyage to Baltimore, the cargo, as shown by the log of the Ensley City, was subjected to no higher temperatures than it had been subjected to when exposed to the heat of the day on the lighters at Basra; in other words, that the softening had already commenced before the cargo was loaded in the hold of the vessel, and that any oozing or leaking, as well as any hardening that followed such oozing or leaking in the course of the voyage, was simply the natural result of change of temperature upon this inherently viscous material.

There is presented here a factual difficulty in that no temperatures were taken in No. 4 tweendecks of the Ensley City, or in fact, in any other hold of the vessel at the time she lay at Basra while this cargo was being loaded, or during any part of her voyage to Baltimore. Respondent offered in the course of the trial, but we excluded them, records of temperatures taken in the various holds of the Ensley City, including No. 4 tweendecks, during other similar voyages. These records were offered for the purpose of showing that the temperatures so taken in No. 4 tweendecks during these other voyages were not substantially different from the corresponding temperatures in any of the other holds. Records were also proffered, but excluded, of outside and under-water temperatures taken on these other voyages, by which the respondent desired to show that such temperatures likewise did not differ, to any material extent, from corresponding temperatures as shown by the log of the Ensley City on this particular voyage.

We excluded all of these records because of the obvious probability of there having been such variations in other important factors, from voyage to voyage, as would materially affect temperatures below decks. That is to say, the type of cargo in the respective holds where the temperatures were taken might be a very material factor affecting temperatures; for example, whether they gave off heat. One of the respondent's witnesses, the superintendent of docks at Baltimore for the Isthmian Steamship Company, respondent owner of the Ensley City, testified that chrome ore, which was taken on the Ensley City at Lourenco Marques and stowed adjacent to the licorice extract, will generate heat when damp. Thus, although in the present case there is no evidence to the effect that this cargo of chrome ore was damp, we are left in a state of pure speculation as to what, if any, effect its proximity to the licorice extract in the closely loaded No. 4 tweendecks might have had upon the licorice extract.

Also, the proffered temperature records taken on other voyages of this same vessel could not be said to have much, if any, probative weight if other important factors are not precisely known, such as the condition of the hatches; the extent to which they may have been open or closed before, or at the time the temperatures were taken; and whether the ventilators, even though the same in character, number and location, were set for operation at the same angle, and whether there were strong or light winds, and from what points of the compass.

Three well known highly competent marine surveyors testified on behalf of libellant that it is customary to put a cargo such as that here in question in the lower holds, because, being below the water-line, they would normally be cooler than No. 4 tweendecks, and that, in fact, the latter was an improper place in which to stow the licorice extract on the Ensley City, especially since its stowage was adjacent to the engine room bulkhead.

As opposed to this testimony for libellant, the master of the Ensley City stated that he considered No. 4 tweendecks an entirely fit place for stowage of cargo of this kind; that he believed the difference between the temperatures in this hold and in others while loading at Basra was not over 10°, and that the same was true throughout the voyage to Baltimore. However, this was the master's first voyage on the Ensley City and the first time he had ever carried licorice extract. Furthermore, and this is very significant, the second officer who, as we have already stated, had direct charge of loading and stowing the cargo, not only admitted that the temperature was usually somewhat cooler in the lower holds than in the tweendecks, but also that it would have been better to have loaded this licorice extract in the coolest part of the ship, which would have been the lower holds. Also, the second officer, like the master, had never previously shipped with a cargo of licorice extract, and it is clear that neither he nor any other officer of the ship had due regard for the notation on the cases in which the licorice extract was shipped, that they should not be stowed near the boilers.

With respect to the matter of ventilation in No. 4 tweendecks, while the evidence on this point is somewhat fragmentary and not completely convincing when considered from the point of view of either side, nevertheless, the testimony given on behalf of the ship with respect to this matter is quite adverse to the shipowner's contention. The chief officer testified that whereas there were four ventilators originally constructed for No. 4 tweendecks, the two forward ones being directly over the space in which the licorice extract was stowed, the two aft ventilators were in the strong room which was completely shut off from that part of No. 4 tweendecks where the licorice extract was stowed unless the door into the strong room was kept open. The second officer confirmed these statements and further testified that the door to the strong room was closed throughout the voyage to Baltimore. In other words, he stated that it was not possible to get the same circulation of air in No. 4 tweendecks with this door closed that would be possible were it open, or if the strong room had not taken up part of the space—a condition which did not exist

with respect to the other tweendeck spaces on the vessel.

Finally, it is very significant that while there is evidence in the case that 261 bags of licorice extract, which formed part of the same shipment which reached Basra by rail in April. 1942, from which the cargo placed on the Ensley City was taken, were shipped out on the Monsuco, a vessel of different ownership, the latter part of June, 1942, counsel for respondent introduced no further evidence with respect to this cargo.

On the state of the testimony as above analyzed, we conclude that libellant has sustained the burden of proof, as he must in order to recover, that the cargo, when accepted on board the Ensley City, was in a marketable condition but that on arrival in Baltimore, its condition was no longer such, and we further conclude that the proximate cause of this change was not "insufficiency of packing," or the character of the cases or bags, or any "inherent defect, quality or vice of the goods," but improper stowage. In order words, we find that while the licorice extract packed in some of the cases at least was, when delivered to the vessel, in a soft, viscous state, nevertheless, all of the cases and bags, when accepted by the vessel, could still be handled as separate pieces, namely, the cargo was marketable; whereas when the cargo arrived in Baltimore, it was no longer capable of being so handled but was, for the most part, in a hard mass, due to the fact that the soft state of the licorice extract when delivered to the vessel, had been *increased* by the high temperature of the place where it was stowed during the first part of the voyage, thereby causing the extract to break out of the cases and bags and to run together; and that thereafter, as the vessel entered the more temperate zones, the extract hardened into a more or less solid, conglomerate mass.

In short, while there was no obligation on the part of the vessel to keep the extract after stowage from becoming *somewhat* either more soft or more hard—because it was characteristic of the extract to be-come more or less viscous with change of temperature—there was an obligation to use every reasonable effort to check its viscosity so that it would not greatly exceed that which it had when taken aboard the vessel; and we are satisfied that such requirement was not met when the vessel's officers, being fully apprised of the character of the cargo, failed to stow it in that part of the vessel where it was the invariable custom to stow cargoes of this type, and where the temperature was indisputably somewhat, if not a great deal lower under all conditions of climate and weather. True, it cannot be said with actual certainty that had the cargo been so placed, its condition upon arrival in Baltimore would have been different. But it is certainly entirely reasonable to infer that had the precaution been taken with respect to this cargo that was customarily taken with respect to other like cargoes, respecting which no evidence of radical change during shipment has been shown, its condition on arrival would not have been materially different from its condition when delivered to the vessel.

The law imposes upon shipowners the duty to use all reasonable means to ascertain the nature and characteristics of goods tendered for shipment, and to exercise due care in their handling and stowage, including such methods as their nature requires. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; The Nichiyo Maru, 4 Cir. 89 F.2d 539; Bank Line v. Porter, 4 Cir., 25 F.2d 843.

It follows, therefore, that the provision for limitation of liability contained in the bill of lading which the vessel owners might properly have asserted as a defense to the claim, had the stowage of the entire cargo not been improper, becomes of no avail.

A decree will be entered for libellant after further hearing which will be granted to determine the amount to be awarded libellant, in the event that the parties are unable to agree on the amount.