SUCREST CORPORATION, Plaintiff,

v.

M/V JENNIFER, etc., and Matthew Shipping, Limited, Defendants.

Civ. No. 74–28–ND.

United States District Court,
D. Maine, N. D.

Aug. 11, 1978.

Martin R. Johnson, Portland, Me., John P. Conroy, New York City, for plaintiff.

Thomas R. McNaboe, Portland, Me., Byron King Callan and Joseph M. Brush, New York City, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DIRECTION FOR ENTRY OF JUDGMENT

GIGNOUX, District Judge.

This action arises out of a nautical mishap which occurred in May 1974, when the dry cargo vessel M/V JENNIFER, while carrying a bulk cargo of salt water damaged raw sugar from Saint John, New Brunswick, Canada, to Brooklyn, New York, developed a severe port list off Bar

Harbor, Maine, because of a transverse shift of the cargo. The JENNIFER put into Bar Harbor where she eventually was purposefully stranded for the safety of both the vessel and the cargo. Sucrest Corporation ("Sucrest"), the owner of the cargo has brought an action in rem against the JENNIFER and in personam against the owner of the vessel, Matthew Shipping, Ltd. ("Matthew"), for damages to the cargo, salvage expenses, and the cargo's contribution in General Average. The ship and her owner deny liability for cargo damage and have, in turn, filed a counterclaim against Sucrest in which they seek hull damage, salvage expenses, damages for lost use of the vessel, and the vessel's contribution in General Average. Jurisdiction evidently is predicated upon 28 U.S.C. § 1333(1) (admiralty and maritime jurisdiction) and § 1332 (diversity jurisdiction).[1]

By agreement of the parties, the issues of liability have been severed from the damage issues, and tried to the Court without a jury. Having received and considered the evidence and the written and oral arguments of counsel, the Court now makes its Findings of Fact and Conclusions of Law on the issues of liability for the casualty, and directs entry of its judgment as follows:

## FINDINGS OF FACT

The Court's Findings of Fact are:

### Introduction

1. *Sucrest.* Sucrest, a New York corporation, is an international sugar refiner. It owns several subsidiary companies including the Revere Sugar Refinery ("Revere") in Charlestown, Massachusetts, and Sucrest Gmbh located in West Germany. Sucrest Gmbh wholly owns Interfood Gmbh ("Interfood"), also headquartered in West Germany. Sucrest Gmbh manufactures specialty food products, and Interfood is a commodity trading corporation.

During April and May 1974, Robert M. Rappaport was president of Sucrest and simultaneously served as a "geschaftsfurer," or, roughly, a managing director, of both Sucrest Gmbh and Interfood.

2. *Matthew.* Matthew was and is a Canadian corporation having a place of business in Montreal, Province of Quebec, Canada. Matthew acquired title to the JENNIFER, formerly the LORNA P, on April 30, 1974. Prior to acquiring title to the JENNIFER, Matthew had time-chartered the vessel on several occasions.

During April and May 1974, Henry C. Druce was general manager of Matthew. At that time, Captain James Rooney served as assistant general manager and acted as marine superintendent for the company.

3. *The JENNIFER.* The JENNIFER, a Canadian flag motor vessel built in 1964, had an overall length of 204 feet, a beam of 36 feet, and a summer draft of 15′ 3″. She was designed as a single hold, single hatch carrier of dry bulk cargo. Her hatch measured approximately 68 feet by 23 feet and opened into a hold 110 feet long and 35 feet wide. The bilge arrangement in the hold consisted of four bilge wells, two forward and two aft. Each well was located on the outboard corner of the hold. They were fitted with perforated covers known as strainer plates and were about two feet deep.

The JENNIFER was powered by a single screw, eight cylinder diesel engine of approximately 1200 horsepower which was capable of driving her at speeds up to 11 knots.

The JENNIFER was lost at sea in the latter part of 1974 in an incident unrelated to the instant action.

4. *The Ship's Personnel.* From April 30, 1974, when Matthew took title to the JENNIFER, until May 10, 1974, Rooney served as temporary master of the vessel. Rooney had held a British Master's Certificate since August 1963. Prior to 1974, he had last sailed as master in 1968. His previous sail-

---

1. Neither Sucrest nor JENNIFER and her owner have recited a jurisdictional basis in the pleadings.

ing experience had included the carriage of three shipments of bulk sugar from Cuba to China.

On May 10, Rooney turned the JENNI-FER over to Captain George H. Anderson, whom Captain Robert Lyon, another Matthew employee, had hired in St. John to take the vessel with a bulk cargo of salt water damaged raw sugar from St. John to Brooklyn. After discharging the sugar, Anderson was to have proceeded with the JENNIFER to Philadelphia to pick up other cargo. Anderson held an unlimited Canadian Master's Certificate, issued in March 1946. Prior to the JENNIFER, Anderson's latest seagoing command had been in 1973. He had no previous experience in the carriage of raw bulk sugar.

Chief Officer of the JENNIFER in May 1974, during the voyage here in issue, was Ronald Cartwright. Shortly before Cartwright joined the vessel, he had been hired by Rooney in Montreal for a shore position with Matthew. His seagoing duty aboard the JENNIFER was to have been limited to the voyage scheduled to end at Brooklyn. Cartwright was issued a First Mate's Foreign Going License by the British Board of Trade in 1958. He assumed a shore position in 1961 and had not returned to sea as a First, or Chief, Officer until he joined the JENNIFER. As Chief Officer of the JEN-NIFER, Cartwright was in charge of cargo supervision and stowage. Although he previously had observed cargos of raw bulk sugar on several occasions, he never before had carried the cargo.

5. *Raw Bulk Sugar.* The carriage of raw sugar in bulk is a relatively recent phenomenon which commenced in the early 1950's. Raw bulk sugar normally is a passive, stable cargo. It is not included among the numerous cargos listed in the dangerous cargo acts of Canada, the United Kingdom, or the United States. *E. g.*, 46 U.S.C. § 170, 46 C.F.R. Part 146 *et seq.* (1977). Raw bulk sugar usually has a moisture content of .05%, a polarization of 98%, and an angle of repose of at least 32°.[2]

### The Purchase of the Sugar

6. The sugar cargo that is the subject matter of this action consisted of raw Australian sugar in bulk which had been damaged by salt water in early 1974 while aboard the M/V GORDION, bound for St. John. At St. John, the consignee of the sugar rejected a portion of the shipment due to the salt water contamination. Laurentide Trading Co., Ltd. ("Laurentide"), a salvage company, then purchased the rejected shipment with the intent of reselling the cargo to another refiner.

7. In early April 1974 representatives of Laurentide contacted representatives of Sucrest with regard to the possible sale of the sugar to Sucrest. On April 9, 1974, Delfin Bacani, assistant laboratory director for Revere, a Sucrest subsidiary, inspected the sugar at St. John in behalf of Sucrest. Part of the sugar was stored inside the Metro Warehouse in St. John. Bacani described the sugar in the warehouse as approximately "⅓ soupy magma and ⅔ wet sugar."[3] The remainder of the sugar was kept outside in an open pit. Some of the sugar left outside was covered by canvas tarpaulins; the rest was exposed to the elements. Bacani and his supervisor, War-

---

2. Polarization is a means by which the purity of sugar can be tested. The lower the polarization, the less pure the sugar. Pure sucrose has a polarization of 100%. Sugar cargos, however, have a polarization less than 100% due to moisture, invert sugars, and other impurities in the cargo. The less pure the sugar, the more difficult it is to refine.

The angle of repose is the angle between a horizontal plane and the cone slope obtained when a bulk cargo is emptied onto the plane. *Thomas on Stowage* (revised ed. 1971) at 326, a recognized authority on the stowage and transportation of cargo, lists the angle of repose for raw sugar at 32°. Captain Frank D. Glover, an expert with extensive experience in the carriage of raw bulk sugar who appeared on behalf of the JENNIFER, testified that he had personally measured the angle of repose and had found it to be 40°. For the purposes of ocean carriage, the lower the angle of repose of a bulk commodity, the more likely it is to shift in the hold of a vessel.

3. Magma is a paste-like mix of raw sugar and sugar syrup. The moisture content of magma is approximately 7% to 8%.

ren L. Reed, advised Sucrest that the sugar still was refinable and that if the purchase price was low enough, Sucrest could profit from the damaged cargo.

8. The negotiation between Laurentide and Sucrest culminated in a written Memorandum of Agreement signed at the Sucrest offices in New York City on April 24, 1974. Under the terms of the Memorandum, the buyer was to purchase the sugar at $.09 per pound and was to pay loading, unloading and transportation charges. Transportation of the cargo from St. John to Brooklyn was to be by ship.

Throughout the negotiations Sucrest was assumed to be the buyer. Sucrest officials represented the buyer, and draft memoranda listed Sucrest as the buyer. However, at the April 24 conference, Sucrest representatives asked Laurentide permission to substitute Interfood as buyer. Sucrest wished to make the change for inter-corporate business purposes. Laurentide agreed to the substitution provided that payment for the cargo would then be guaranteed by a letter of credit issued on a New York bank. Sucrest accepted this condition and Interfood was listed as the buyer. Rappaport, Sucrest's president, signed the Memorandum for Interfood in his capacity as geschaftsfurer. No other Interfood officials or employees participated in the transaction with Laurentide. Two days later, on April 26, 1974, Interfood sold the sugar to Sucrest for $.17 per pound.

9. Pursuant to the agreement with Laurentide, Sucrest arranged with its banker, the Chase Manhattan Bank ("Chase") in New York City to obtain a letter of credit to finance the transaction. The letter of credit nominally was issued on the account of Interfood and named Laurentide as the beneficiary. At the time the letter of credit was procured, Interfood had no account with Chase and, as a practical matter, Chase issued the letter of credit on the credit of Sucrest.[4]

The terms of the Memorandum of Agreement provided that Laurentide would receive partial payment on the letter of credit upon presentment of a bill of lading showing delivery of the sugar aboard the carrier at St. John. The balance was to be paid upon discharge of the sugar at its port of destination. Laurentide subsequently received payment from Chase on two occasions, pursuant to the Memorandum. On each occasion Chase charged Sucrest, not Interfood, for the sum it had paid to Laurentide. Chase also endorsed the bill of lading which it had received from Laurentide to Sucrest, not Interfood. The bill of lading was never negotiated between Interfood and Sucrest.[5]

### The Charter of the JENNIFER

10. Sucrest, through its ship brokering agent, Maxwell Harris Co., Inc., and with the assistance of Laurentide, arranged with Druce and Rooney to charter the JENNIFER for the transportation of the damaged sugar in bulk from St. John to Brooklyn. The charter party, which was based on the Uniform General Charter (Gencon) form as approved by the Documentary Council of the Baltic and White Sea Conference and revised in 1922, contained an "FIO," or "free in, free out," clause, which meant that the shipper and receiver, respectively, were responsible for the risk and expense of loading and discharge of the cargo.[6] The charter party said nothing with respect to stowage and trimming of the sugar.

---

**4.** Allerton D. Marshall, the Sucrest official who arranged the financing, conceded that Chase relied on Sucrest, its established client, for reimbursement in the event that Interfood did not make repayment.

**5.** Interfood later reimbursed Sucrest for the amounts which Sucrest had paid in its behalf on the letter of credit. Sucrest subsequently paid Interfood for the sugar which it purchased from Interfood on April 26 by direct payment

in West German marks and through credits entered on intercompany accounts.

**6.** The charter party document itself contains only a "free out" clause. Because the charter party was negotiated hurriedly, the "free in" clause was omitted through inadvertence. However, according to Donald Harris, the employee of Maxwell Harris Co., Inc. who brokered the charter, all parties recognized that loading was to be "free in."

As a Gencon charter, the charter party also carried the standard Gencon clause limiting the liability of the vessel's owner for loss of or damage to the cargo. That clause, clause 2 of the charter party, states in pertinent part:

Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

Stricken from the Gencon charter form was the U. S. Clause Paramount, which is employed to incorporate the terms of the Carriage of Goods by Sea Act of the United States ("COGSA"), 46 U.S.C. § 1300 *et seq.*, into a charter contract.

11. The charter party was signed at the Sucrest offices in New York City on April 24, 1974. Although Interfood formally was listed as charterer, no Interfood personnel were involved in negotiating the charter party. Rappaport signed the charter party in behalf of Interfood.

### The Loading of the Cargo

12. The JENNIFER arrived at Long Wharf A in St. John at 0200 on Friday, May 10, 1974 to prepare for the loading of the sugar. She had sailed to St. John from Georgetown, Prince Edward Island, Canada, where she had undergone minor repairs, largely of a cosmetic nature, following the transfer of her title to Matthew on April 30. She left Georgetown for St. John on May 7 under the command of Captain Rooney.

During the crossing from Georgetown to St. John, Chief Officer Cartwright began to ready the JENNIFER's hold for the sugar cargo. The hold was swept clean and washed down, and the bilges pumped dry.

13. During the morning of May 10, Rooney, Cartwright, other ship's officers, and a representative of Empire Stevedoring Co., the stevedore retained by Sucrest, discussed the loading of the cargo. Rooney at that time ordered the stevedore to lay down sheets of heavy duty polyethylene horizontally across the floor of the hold and up the sides of the vessel. The sheeting covered the entire tank top, including the bilge wells. The purpose of the sheeting was to protect the cargo from moisture and impurities in the hold and to prevent sugar from clogging the bilge wells.

Neither Rooney nor any other officer of the JENNIFER ordered that the hold be fitted with transverse shifting boards.[7]

14. While the JENNIFER was en route to St. John, the sugar had been trucked from the Metro Warehouse to Long Wharf A, where it was stored in the open. The sugar was heaped in a series of irregularly shaped piles about four feet high and was partially covered by polyethylene sheets, which were held down by dunnage. A few pools of sugar syrup had formed between the peaks of the piles. The sugar appeared darker than most raw sugar cargos.

15. Loading commenced at approximately 1300 on May 10. At that time Rooney was still master of the JENNIFER. He did not turn the vessel over to Captain Anderson until 1800 that day. Cartwright as cargo officer supervised the loading operation.

The sugar was loaded by a shore-based crane equipped with a clam bucket. The sugar was dropped into the hold through the open hatch and was loaded from forward to aft. When dropped, the sugar peaked normally and did not flow. During loading, Cartwright had the stevedores use the clam bucket and the dragline to push the sugar into the wings of the hold and to trim the cargo. The cargo generally sloped aft following loading and trimming.

---

**7.** Shifting boards are installed fore and aft in a ship's hold to prevent bulk cargos which are fluid or which shift easily from moving transversely and thereby causing the ship to list.

Loading continued throughout the afternoon and into the evening and was completed at approximately 2330.

16. About 30 minutes before loading was completed, it began to rain with increasing intensity. Both because of the rain, and because the remaining cargo on the dock seemed wetter than that which first had been loaded, Cartwright ordered the hatch closed before all of the sugar was transferred from the dock to the hold.[8]

17. At approximately 1800 on May 10, during loading, Robert Tymann, a sugar chemist who was the assistant refinery manager at Revere, arrived at the JENNIFER. Sucrest had sent Tymann to St. John to take samples of the sugar and to pay the master of the JENNIFER for transporting the cargo. Tymann appeared in St. John as a sugar chemist and courier and not as an expert on the stowage or transportation of raw bulk sugar.

While at the dock, Tymann took representative samples from the sugar piles. The sugar did not appear to be close to the flow point. Although Tymann conducted no tests of the sugar at St. John, since he was without laboratory equipment, he estimated the moisture content of the sugar to be 3% to 4%. Subsequent laboratory tests conducted on the samples which Tymann gathered in St. John revealed the sugar to have had a moisture level of 5.68% and a polarization of 93%.[9]

18. The next morning, May 11, Tymann paid the agreed upon freight charge to Roo-

ney by check and received in return a copy of the bill of lading. The original bill of lading negotiable in form was delivered to Laurentide. It was signed by Matthew's president, Druce, and listed Laurentide as the shipper, Chase Manhattan Bank as the consignee, with notification to Interfood. The bill of lading recited that it was "subject to all terms, conditions and exceptions of charter party dated at New York, N.Y. April 24th, 1974" and that "vessel not responsible for quantity, condition or quality." It described the cargo as approximately 1250 short tons of raw Australian sugar in bulk, salt water damaged.[10]

19. During the morning of May 11, Cartwright ordered the hatch opened in order to inspect the cargo. The cargo had not shifted or changed its appearance overnight. There were no signs of wetness, the cargo was trimmed to Cartwright's satisfaction, and the ship was level.

20. At 1500 on May 11, soundings of the JENNIFER's bilge wells were taken. The bilge wells, which were two feet deep, had approximately 12 inches of liquid in the forward wells and approximately nine inches in the aft wells.

*The Voyage and the Stranding*

21. The JENNIFER departed St. John at approximately 1610 without incident.[11] Sea conditions were calm.

22. At 0200 on Sunday, May 12, while located at 44° 08′ north latitude and 67° 45′ west longitude, in the Gulf of Maine off

---

8. Anderson also apparently was concerned that the wet sugar remaining on the dock, which also contained an inordinately high degree of rubbish and similar debris, would contaminate the better quality sugar which had been loaded in the hold.

9. The flow point of raw sugar, the point at which the sugar flows like a liquid rather than holds its shape like a dry commodity, is reached when the moisture content of the sugar is approximately 9%. *See Discussion, infra.* A polarization of 93% indicates the sugar to have been of poorer quality than the average cargo of raw sugar. *See* Finding No. 5, *supra.*

10. Rooney estimated the weight of the cargo by examining the JENNIFER's draft.

11. At one point during the trial, plaintiff suggested that the JENNIFER may have grounded out and holed herself while berthed at St. John. There is no credible evidence to support a finding that the ship grounded out and was holed in St. John. The various marine surveyors who inspected the JENNIFER in dry dock, including plaintiff's own expert surveyor, uniformly agreed that the hull damage and holing which the JENNIFER sustained was caused by her stranding at Bar Harbor and not by grounding out at a berth. None of the ship's officers reported a grounding and her records contain no reference to such an incident.

Bar Harbor, the JENNIFER suddenly developed a 10° list to port. The Second Officer, who was on watch, immediately notified Anderson. A cursory examination of the hold revealed that the cargo had shifted. Anderson then ordered a May Day call to the United States Coast Guard. The Coast Guard ordered the JENNIFER to proceed to Bar Harbor and dispatched two vessels to escort her. During the passage to Bar Harbor, the list increased to 17°.

23. The JENNIFER arrived at Bar Harbor at approximately 0630 on May 12 and tied up at the Canadian National ferry dock. Her port list by then was 18°, and her port side deck line was under water. At this list, a small amount of water entered the hold through a gap between a cable entry pipe and the deck hole through which the pipe passed. No other water entered the hold from an exterior source during the voyage.[12]

24. Because the JENNIFER continued to list at the dock, Matthew, with the advice and assistance of the Coast Guard, decided to strand the vessel for the safety of both vessel and cargo. The list ultimately increased to 23°. The JENNIFER was towed about 300 feet from the berth and hauled onto the beach. The stranding occurred at approximately 1630 on May 12.

25. The JENNIFER lay stranded until May 16, when salvage operations began. The salvors pumped some 40 tons of liquid out of the vessel's hold, after which she was refloated and anchored. The next day, May 17, the JENNIFER was berthed at the Bar Harbor town dock where the rest of her cargo was discharged. Subsequently, the cargo was trucked to Searsport, Maine, and eventually to Brooklyn.

12. *See* note 11 *supra*, and *Discussion, infra*.

13. The warmer the temperature, the quicker the degradation. Not only was the hold covered and protected, unlike the open storage area at the pier, but the ship itself entered warmer waters as she left the Bay of Fundy and sailed in close proximity to the Gulf Stream. These waters warmed the hull and, consequently, the hold.

## The Shifting of the Cargo

26. In Bar Harbor, the appearance and properties of the sugar had changed dramatically from when it had been loaded and inspected at St. John. The sugar had shifted transversely to port in the JENNIFER's hold. There were many large pools of syrup in the hold, particularly in the aft port section, whereas there had been no discernible pools in the hold at St. John. Much of the sugar looked like mud. It was mobile and free flowing. Other portions of the cargo were hard and crusty.

When the sugar was lifted out of the hold into the salvage scow, and, later, onto the town pier, it was dark brown in color and had the consistency of semi-liquid mud. It had no angle of repose and flowed freely. Laboratory tests of samples taken at Bar Harbor revealed the moisture content of the sugar to have risen to 9% and the polarization to have declined to 90.1%.

27. During the passage from St. John, the biological degradation of the sugar, which had commenced when the cargo first was contaminated, not only continued but accelerated, due to the fact that air temperatures in the hold were higher than temperatures on the open pier in St. John.[13] As a result of this ongoing bacteriological change, additional moisture and lubricants, in the form of water, alcohol, and carbon dioxide, were produced.

28. Under the perpetual vibration of the ship's engine and the roll of the ship, the moisture in the cargo, which was intensifying due to biological degradation, drained downward toward the bottom of the hold. The sugar particles became packed together more closely, and the effective moisture content of the lower portion of the cargo rose. The cargo at this point became a thixotropic.[14] In the hold of the JENNI-

14. A thixotropic is a commodity the fluidity of which increases when a substantial force is applied against it. The greater the force, the more fluid the thixotropic becomes. A common example of a thixotropic is dripless paint. The force of gravity alone is insufficient to change the paint's gel-like, nonfluid consistency. When brushed, however, the paint flows because of the added force of the brush stroke.

FER, the force of the sea rolling the ship caused the sugar, after its effective moisture content had increased through vibration and bacteriological change, to shift transversely. Since the ship's return roll was caused by gravity and not by waves, and since the force of gravity was less than the force of the waves, not all of the sugar flowed back to its original position on the return roll. Hence, the list developed which became more pronounced with repeated wave movement.

29. This maritime casualty marks the first instance in which the maritime or scientific community learned of the thixotropic properties of raw sugar.[15]

15. In finding the cause of the change in and shift of the sugar cargo, the Court has relied on the testimony of defendants' experts, Captain Frank D. Glover, who has had 17 years of experience in the carriage of bulk sugar, and Dr. Arthur Suddaby, a scientific consultant on the carriage of goods by sea with a background in physics, chemistry and mathematics. Plaintiff offered no similarly qualified experts on the characteristics of sugar or the carriage of bulk sugar by sea. *See Discussion, infra.*

16. The parties have argued at length the question of whether COGSA or the charter party is the instrument which controls their rights and liabilities. Both sides nevertheless admit that the primary effect of the resolution of the issue simply is to determine which side bears the burden of proof. *Margarine Verkaufsunion Gmbh v. M.T. G.C. Brovig,* 318 F.Supp. 977, 979 at n. 10 (S.D.N.Y.1970). If COGSA is the applicable standard, then Matthew has the ultimate burden of establishing its freedom from fault. 46 U.S.C. § 1304(2)(q); *Nichimen Company, Inc. v. M/V Farland,* 462 F.2d 319, 329 (2d Cir. 1972); *M. W. Zack Metal Co. v. S. S. Birmingham City,* 311 F.2d 334, 337 (2d Cir. 1962), *cert. denied,* 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); *see Schnell v. The Vallescura,* 293 U.S. 296, 303–07, 55 S.Ct. 194, 79 L.Ed.2d 373 (1934). If, on the other hand, the charter party controls, then the burden rests on Sucrest to establish Matthew's fault. *Margarine Verkaufsunion Gmbh v. M.T. G.C. Brovig, supra; see Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 108–10, 62 S.Ct. 156, 86 L.Ed. 89 (1941). In the instant proceeding, the determination of this question has no other practical effect, since, as the parties agree, the governing standards of COGSA and of the charter party are similar in all presently material respects. *Compare* clause 2 of the charter party, *see* Finding of Fact No. 10, *supra, with* 46 U.S.C. §§ 1303(1), (2), 1304(1),

## DISCUSSION

■■ Sucrest essentially argues that Matthew is responsible for the damage to the sugar because Matthew failed to exercise due diligence to make the JENNIFER in all respects seaworthy, and improperly or negligently stowed the cargo. Matthew, conversely, denies unseaworthiness of the JENNIFER or negligence on its part and asserts that Sucrest was negligent in not informing it of the inherently dangerous condition of the cargo, a condition of which, Matthew claims, Sucrest was aware or should have been aware. On the entire record and the foregoing Findings of Fact,[16] the Court concludes:

(2). Moreover, regardless of where the burden of persuasion lies, the Court's Findings of Fact in no case are predicated upon a determination that a party has not carried its burden of persuasion.

Although the practical impact of determining whether COGSA or the charter party is the controlling instrument is minimal, in order that there may be no ambiguity as to the basis of the Court's holdings, the Court has resolved the question and, for the reasons briefly stated herein, concludes that the charter party governs the rights and liabilities of the parties. COGSA, of course, would apply if the bill of lading served as the contract for the carriage of the sugar. 46 U.S.C. § 1300; *Nichimen Company, Inc. v. M/V Farland, supra* at 328. Since the evidence clearly shows that Interfood was no more than the mere instrumentality of Sucrest, under settled principles Sucrest must be regarded as the true charterer of the JENNIFER; clearly, Sucrest was not the innocent transferee of the bill of lading for whose protection COGSA was enacted. *Chilean Nitrate Sales Corp. v. The Nortuna,* 128 F.Supp. 938, 940 (S.D.N.Y.1955); Gilmore and Black, *The Law of Admiralty* (2d ed. 1975) § 4–10, at 218–19; *see Sarantex Shipping Co. v. Wilbur-Ellis Co.,* 391 F.Supp. 834, 887–88 (D.Ore.1975); *see also Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960). Where, as in the present case, the charterer holds the bill of lading, it is equally well settled that the bill of lading serves merely as a receipt for the cargo and does not function as the contract for the carriage of the goods. *The Marine Sulphur Queen,* 460 F.2d 89, 103 (2d Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). In such circumstances, the charter party, not the bill of lading, and, hence, not COGSA, governs the relationship between the parties, unless the charter specifically adopts the bill of lading as regulating the rights of the parties. Gilmore

(1) That Matthew exercised due diligence in the discharge of its duty to make the JENNIFER seaworthy in all respects;

(2) That Matthew did not improperly or negligently stow the cargo;

(3) That Sucrest had no knowledge of and had no reason to know of the inherently dangerous nature of the cargo, and, therefore, was not negligent in failing to warn Matthew of the danger.

Consequently, the Court holds that neither Matthew nor Sucrest was guilty of any fault which was a proximate cause of the incident in question. Both plaintiff's complaint and defendants' counterclaim must therefore be dismissed.

## Fault of Matthew

■ Clause 2 of the charter party imposes liability for cargo damage on Matthew if any one of three events caused the damage:

(1) improper or negligent stowage of the sugar, unless Sucrest, its stevedores or servants performed the stowage;

(2) personal want of due diligence on the part of Matthew or its Manager to make the JENNIFER in all respects seaworthy and to secure that she was properly manned, equipped and supplied; or

(3) the personal act or default of Matthew or its Manager.

Specifically, Sucrest contends that Matthew failed to use due diligence to make the JENNIFER in all respects seaworthy and to secure that she was properly manned, equipped and supplied (a) in accepting a cargo of salt water damaged raw bulk sugar for a single hold cargo vessel like the JENNIFER; (b) in accepting the cargo without first determining its moisture content and flow point; (c) in not installing shifting boards; (d) in not taking bilge soundings until 15 hours after loading was completed; and (e) in turning the JENNIFER over to a new master within 24 hours of sailing. Sucrest further contends that the sugar was improperly and negligently stowed by Matthew (a) in covering the bilge wells in the hold with polyethylene sheeting; (b) in loading the cargo during the rain; and (c) in not trimming the cargo.[17] Each of these alleged faults will be discussed seriatim.

### 1. Seaworthiness

■ Matthew did not fail to use due diligence by accepting the cargo of sugar aboard the JENNIFER. Central to the concept of seaworthiness is the duty of the owner to furnish a vessel properly equipped to handle the proposed cargo. *The Southwark,* 191 U.S. 1, 9, 24 S.Ct. 1, 48 L.Ed. 65 (1903); *see Oxford Paper Co. v. The Nidar-*

and Black, *supra.* The charter party here in issue unlike that in *Nichimen Company, Inc. v. M/V Farland, supra,* does not contain such a clause. Consequently, in the instant case, the charter party functions as the contract for the carriage of the sugar, COGSA is inapplicable, and the charter party establishes the rights and obligations of the parties.

17. Matthew insists that, because of the FIO term in the charter party, it had no responsibility with respect to the stowage of the cargo. Although the duty to load, stow, trim and discharge cargo and the consequences for failing to do so properly normally fall upon the shipowner, *e. g., Nichimen Company, Inc. v. M/V Farland, supra* at 330; *Munson S.S. Line v. Glasgow Nav. Co.,* 235 F. 64, 67 (2d Cir. 1916), *cert. denied,* 243 U.S. 643, 37 S.Ct. 405, 61 L.Ed. 944 (1917), these duties may be shifted contractually to the charterer. *Nichimen Company, Inc. v. M/V Farland, supra* at 330–31; *The Kaupanger,* 241 F. 702, 704 (S.D.N.Y.1917).

However, unlike the charter party in the *Nichimen* case which obligated the charterer to

"load, stow, and trim the cargo," the charter party here is silent with regard to responsibility for stowage and trim. The obligation properly to stow and trim consequently remained with the carrier. *See Nichimen Company, Inc. v. M/V Farland, supra.* That the FIO clause did not transfer stowage and trimming duties but only fixed payment for loading and unloading was made apparent by the very behavior of the parties. Rooney, Cartwright and Anderson assumed responsibility for stowage and trim, not Empire Stevedoring Co., the stevedore hired by Sucrest. Furthermore, as Harris the charter broker testified, the FIO term generally is not understood to comprehend stowage and trim but only loading and unloading costs. If responsibility for stowage and trim are to be transferred to the charterer, the charter party contains what the industry calls an FIOST clause, similar to that written into the charter party at issue in the *Nichimen* case and not present in the agreement between Sucrest and Matthew.

*holm,* 282 U.S. 681, 685, 51 S.Ct. 266, 75 L.Ed. 614 (1931). To this end, the owner must use all reasonable means to ascertain the nature and characteristics of the goods tendered for shipment, *e. g., The Ensley City,* 71 F.Supp. 444, 449 (D.Md.1947), *aff'd,* 170 F.2d 27 (4th Cir. 1948), and is charged with the knowledge it would have or should have acquired through the discharge of this duty. *Anderson v. Lorentzen,* 160 F.2d 173, 175 (2d Cir. 1947). However, the owner's duty to exercise due diligence to render the ship seaworthy "cannot be extended so far as to require the carrier to take measures to avoid a danger of which he did not know and could not reasonably be expected to know." *Heath Steel Mines, Ltd. v. The Erwin Schroder,* [1970] Can.Exch. 426, 440.[18]

■ Raw sugar is a commodity which has been transported successfully in bulk carriers such as the JENNIFER for nearly a quarter of a century. Indeed, as both Captain Glover, who testified in behalf of Matthew, and *Thomas On Stowage, supra* at 399, a treatise upon which Sucrest frequently relies, agree, bulk transportation of raw sugar is a safe and accepted means of water carriage. The JENNIFER was an appropriate vessel in which to carry raw sugar in bulk; Matthew was not negligent in tendering her for that purpose.

■ Sucrest further argues that, notwithstanding the customary use of bulk carriers to transport raw sugar, the vessel was not equipped to handle salt water damaged sugar and that Matthew, through Rooney, failed to exercise due diligence in not determining the moisture content and flow point of the sugar before accepting the cargo. Sucrest points to the fact that pools of water had gathered in the sugar as it lay on the wharf as evidence available to Matthew which indicated the dangerous state of the cargo. Nevertheless, the uncontra-

dicted testimony of Captain Glover was that pools of syrup always form in raw sugar. The existence of the pools did not foreshadow the volatile nature of the sugar.

To be sure, no agent of Matthew analyzed samples of the sugar prior to loading, but the on-site inspection by Sucrest's own representative, Tymann, and the laboratory results of the samples which he took did not reveal the sugar to be flowing or dangerously moist. Tymann reported that the sugar remained peaked in piles after having been dumped at Long Wharf A, and the moisture content of the sugar at that time was 5.08%, considerably below the 9% flow point of raw sugar. Even if Matthew had taken laboratory tests of the sugar, the tests would not have alerted it to the hazards of carrying the cargo. Matthew cannot be faulted for accepting the cargo in the condition as it appeared prior to loading. *Heath Steel Mines, Ltd. v. The Erwin Schroder, supra*; *see The Nitroglycerine Case,* 82 U.S. (15 Wall.) 524, 536–37, 21 L.Ed. 206 (1872).

■ Similarly, Matthew cannot be charged with failing to exercise due diligence to make the JENNIFER seaworthy with respect to the decision not to install shifting boards. Sucrest cites a section of *Thomas On Stowage, supra* at 302, which reprints the International Marine Consultation Organization ("IMCO") Code of Practice for Bulk Cargos, for the proposition that the JENNIFER properly should have been fitted with shifting boards. That portion of the IMCO Code, though, deals specifically with the carriage of ore concentrates, a bulk commodity with characteristics different from those of raw bulk sugar.[19] Not only is the reference to the IMCO Code inapposite, but *Thomas On Stowage* itself, at 399, particularly states that in the transportation of raw bulk sugar, "No shift-

---

**18.** Although *The Erwin Schroder* involved an interpretation of the U.S. COGSA, the concepts of due diligence and seaworthiness as employed in COGSA bear the same meaning as when used in a charter party. Gilmore & Black, *supra,* § 4–5, at 208.

**19.** All of the expert witnesses uniformly agreed that ore concentrates differ considerably from sugar in regard to cargo handling. For example, whereas sugar particles, to a certain degree, will absorb excess moisture, ore concentrates will not but instead will tend to flow more readily upon the introduction of added moisture.

ing boards are required whether the compartment is wholly or partly filled." Because of the normally passive characteristic of raw sugar, the seaworthiness of the carrying vessel is not impaired by the absence of transverse shifting boards. Matthew did not fail to exercise due diligence to make the JENNIFER seaworthy by not installing shifting boards.

 Sucrest likewise relies on the IMCO Code to establish that Matthew committed error in not taking bilge soundings immediately upon completion of loading the sugar cargo. As the Code makes clear, however, the reason for sounding the bilges soon after loading is to determine whether the bulk cargo, because of its weight and the velocity at which it customarily is loaded, has damaged the bilge system. *Thomas On Stowage, supra* at 306, IMCO Code §§ 2.9, 2.10. This purpose was fully served when the soundings were taken at 1500 on May 11. The bilges, which had been cleaned and prepared for loading on the voyage from Prince Edward Island, worked satisfactorily at that time. The timing of the bilge soundings in no way jeopardized the seaworthiness of the JENNIFER.

 Sucrest also faults Matthew, through Rooney, for turning command of the JENNIFER over to Captain Anderson less than 24 hours before she departed St. John. Anderson had not previously carried a cargo of raw bulk sugar. Because of Anderson's lack of familiarity with the cargo, and due to the relatively short period in which Anderson had command of the vessel before she sailed, Sucrest argues, Matthew breached its obligation to assure that the JENNIFER was properly manned. However, Captain Glover testified without contradiction that it is routine for a master to receive a briefing and to take command of a ship with a cargo new to him in as little as four hours before sailing. Glover noted that, if the exigencies of a situation so require, command can be transferred in two hours. Significantly, Captain William Wheeler, a maritime expert who appeared in behalf of Sucrest, made no mention of Anderson's status as a new master during

his discussion of the casualty. Rooney cannot be faulted for the manner in which he handed the JENNIFER over to Anderson; Matthew did not violate its duty to exercise due diligence in manning the vessel.

### 2. Stowage of the Cargo

 Sucrest assigns error to Matthew's stowage of the cargo on three grounds. First, primarily on the basis of Captain Wheeler's testimony, Sucrest claims that Rooney's decision to lay polyethylene sheeting across the hold and over the bilge wells prevented the cargo from draining and thereby caused the liquification of the sugar and the list which imperiled the ship. Wheeler, in turn, referred frequently to *Thomas On Stowage* while testifying as to the alleged imprudence of covering the bilge wells. Wheeler's opinion, nonetheless, was predicated on general axioms of cargo stowage and not on his personal experience with the handling of raw bulk sugar. Wheeler himself had never carried a cargo of bulk sugar during his years at sea and had no direct knowledge of the commodity.

On the other hand, both Captain Glover and Dr. Suddaby, experts with considerable knowledge of the properties of raw sugar, testified emphatically that moist bulk sugar of the type loaded aboard the JENNIFER would not drain effectively through the ship's bilge wells. Because of the viscosity of the sugar, Glover and Suddaby explained, the sugar, if allowed to drain, simply would have plugged up the small apertures in the strainer plates which covered the bilge wells. Rather than facilitating the handling of the cargo, leaving the bilge wells and strainer plates uncovered would have clogged the bilge wells with the sugar and would have rendered the bilge system inoperable. As well as Glover and Suddaby, Jan Bijhouwer, a marine surveyor who testified in behalf of Sucrest, refused to attribute the cause of the casualty to the covering of the bilge wells. The record does not support Sucrest's claim that the use of the polyethylene sheeting was either negligent or improper.

■ As a second error, Sucrest points to the fact that some of the cargo was loaded in the rain. Although raw bulk sugar ordinarily should not be loaded during rain or snow, due to the damage which the moisture can cause to the sugar, *Thomas On Stowage, supra* at 398, any damage which occurred as a result of the rain at St. John was minimal. During a ten and one-half hour loading operation, only 30 minutes of loading took place in the rain. Moreover, Chief Officer Cartwright halted the loading of the most seriously damaged sugar. Given the limited exposure of the cargo to the rain during loading and the prudent action of Cartwright in not accepting the last loads of sugar, the Court cannot find that the brief period of loading the cargo in the rain significantly contributed to the damage to the cargo or to the instability of the vessel.

■ Sucrest also claims that Matthew was negligent because it failed to trim the sugar after it had been placed in the hold. There exists no basis in fact to support this contention. Sucrest cites the testimony of Tymann, who stated that the sugar had peaked when it was dropped into the hold. But Tymann observed the loading operation for only a few minutes, and he admittedly had no experience in the area of cargo handling or stowage. To the contrary, Cartwright testified that during loading, the clam bucket and drag line were employed to flatten the cargo and push it into the wings. He further stated that when he inspected the sugar on the day following loading, the cargo appeared to be adequately trimmed. On the facts before it, the Court must conclude that the cargo was in fact appropriately stowed and trimmed.

Despite the numerous negligent or improper acts or omissions which Sucrest attempts to ascribe to Matthew, the record establishes that Matthew fully discharged its duty to exercise due diligence to make the JENNIFER seaworthy and to properly stow the cargo. The Court can find no fault on the part of Matthew which was a proximate cause of the incident here in issue.

### Fault of Sucrest

■ In its counterclaim, Matthew asserts that Sucrest was negligent because of its failure to warn Matthew of the potentially hazardous nature of the sugar. Matthew argues that, because of Bacani's report of his April 9 inspection, in which he described part of the sugar located at the Metro Warehouse as "soupy magma," Sucrest had actual knowledge of the cargo's inherent danger. Matthew additionally contends that, since it was a sugar refiner, Sucrest ought to have known of the hazards which the cargo presented.

As Matthew correctly notes, under maritime common law in the United States a cargo owner is under the obligation of informing a carrier of inherent dangers in the cargo of which the cargo owner is aware or ought to be aware and of which the carrier is not aware and cannot reasonably be expected to be aware. *The William J. Quillan,* 180 F. 681, 682–84 (2d Cir.), *cert. denied,* 218 U.S. 682, 31 S.Ct. 229, 54 L.Ed. 1208 (1910); *Aktieselskabet Fido v. Lloyd Brazileiro,* 267 F. 733, 736–37 (S.D.N.Y. 1919), *aff'd,* 283 F. 62 (2d Cir.), *cert. denied,* 260 U.S. 737, 43 S.Ct. 97, 67 L.Ed. 489 (1922); 2A *Knauth's Benedict on Admiralty* (7th ed. 1977) § 99, at 9–15, 9–16.[20] In the case at bar, since Matthew neither knew of nor reasonably should have known of the hazards in carrying the sugar, Sucrest was

---

**20.** Matthew does not argue that the cargo owner warrants absolutely that the cargo contains no inherent dangers unknown to the shipowner. Apparently, under the common law of England, unless the shipowner has actual or constructive knowledge of a cargo's hazards, the cargo owner impliedly warrants that his goods are fit for ordinary carriage and are not hazardous. *Scutton On Charter Parties* (18th ed. 1974), at 100 n. 80; *but see Carver On Carriage By Sea* (12th ed. 1971), at 595–98. In the United States, the cargo owner is not held to such an absolute warranty but only to knowledge actually or constructively within its possession. *The William J. Quillan, supra* ; *Aktieselskabet Fido v. Lloyd Brazileiro, supra* ; 2A *Knauth's Benedict On Admiralty, supra* ; *cf.* 46 U.S.C. § 1304(3); *contra, Pierce v. Winsor,* 19 F.Cas. 646, 651 (No. 11,150) (C.C.D.Mass. 1861).

obligated to give Matthew notice of such hazards within its actual or constructive knowledge.

Sucrest, however, had neither actual nor constructive warning of the dangerous properties of the sugar. Bacani's report indicated that the sugar was of poorer quality than a normal cargo of raw sugar, but gave no portent of the sugar's potential instability. The later, more thorough inspection which Tymann conducted during loading undercuts the accuracy of Bacani's characterization of portions of the sugar as magma and further suggests that the sugar was a passive, safe cargo.[21] Sucrest realized that the sugar was salt water damaged, but in no sense had actual knowledge of the cargo's innately hazardous condition.

Neither is Sucrest chargeable with constructive knowledge of the cargo's hazards. The critical, overriding factor upon which an examination of Sucrest's and, indeed, Matthew's liability turns is that the inherently dangerous propensities of salt water damaged raw bulk sugar were unknown either to the sugar industry or in maritime circles at the time of the incident here in question. Neither Glover nor Suddaby had previously encountered a situation where,

without the ingress of additional water into the hold during the voyage, a cargo of moist raw sugar assumed a thixotropic state and flowed as a result of engine vibration and biological degradation. Suddaby himself had doubted the thixotropic properties of raw sugar until his laboratory experiments in preparation for the trial proved otherwise.[22] Just as Matthew cannot be held liable for failing to equip the JENNIFER for a cargo the hazards of which it reasonably could have no knowledge, *Heath Steel Mines, Ltd. v. The Erwin Schroder, supra*; *see The Nitro-glycerine Case, supra,* Sucrest likewise cannot be held negligent for failing to inform Matthew of these unknown and, apparently hitherto undiscovered, dangers. *The William J. Quillan, supra*; *Aktieselskabet Fido v. Lloyd Braziliero, supra*; *2A Knauth's Benedict On Admiralty, supra.* The Court can find no fault on the part of Sucrest which was a proximate cause of the cargo shift and the subsequent stranding of the JENNIFER.

## CONCLUSIONS OF LAW

The Court's conclusions of law are:

1. This Court has jurisdiction of the actions and of the parties thereto. 28 U.S.C. §§ 1333(1) and 1332(a)(2).

21. As previously noted, Tymann stated that, when he observed it, the sugar was not flowing, and the laboratory test of the sugar samples which he had collected revealed the moisture content of the sugar, 5.68%, to be less than the flow point of raw sugar, approximately 9%, and the moisture level of magma, typically 7% to 8%.

22. In the course of examining the cause of the incident which occurred aboard the JENNIFER, Suddaby conducted a series of tests designed to indicate the effects of moisture and vibration on raw bulk sugar. Suddaby used raw Trinidadian sugar in the experiment which, he stated, has approximately the same particle size and other characteristics similar to raw Australian sugar. The test consisted of forming raw sugar into a mold, placing the molded sample on a vibrating table, removing the mold and observing whether the sugar flowed after considerable vibration. The test was repeated with increasing moisture levels in the sugar. The moisture level was calculated by weight. The mold used contained about one kilogram of sugar and was the same type of mold used in IMCO Code tests of bulk commodities. The vibrating table was operated at 200 cycles per

minute at an amplitude of .25 millimeters. These settings replicated the vibrations produced by a ship's engine.

At moisture contents up to 7%, the sugar sample, when unmolded, yielded a firm product which did not flow when vibrated. At 9%, the moisture content of the sugar samples taken at Bar Harbor, the sugar gave a firm profile when removed from the mold. It was somewhat shinier than other samples because of the added moisture, but otherwise was comparable to them. Yet after 30 minutes of vibration, unlike the other samples, the 9% mixture showed considerable flow at the base of the sample, which visually resembled the sugar cargo as it appeared in Bar Harbor.

The Court is satisfied that Suddaby's experiment reproduced in substantial similarity the conditions which existed aboard the JENNIFER. The test results are therefore admissible in evidence and are entitled to considerable weight. *Lever Brothers Co. v. Atlas Assurance Co.,* 131 F.2d 770, 777 (7th Cir. 1942); *Weaver v. Ford Motor Co.,* 382 F.Supp. 1068, 1072–73 (E.D.Pa.1974), aff'd, 515 F.2d 506 (3d Cir. 1975).

2. Matthew neither failed to exercise due diligence in making the JENNIFER seaworthy in all respects nor improperly or negligently stowed the sugar cargo. No fault of Matthew constituted a proximate cause of the damage to the cargo.

3. Sucrest neither knew of nor reasonably should have known of the inherently dangerous nature of the sugar cargo, and therefore was not negligent in failing to warn Matthew of the danger. No fault of Sucrest constituted a proximate cause of the cargo shift and the subsequent stranding of the JENNIFER.

### DIRECTION FOR ENTRY OF JUDGMENT

In accordance with the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED, ADJUDGED and DECREED

(1) That in this action final judgment be entered dismissing Sucrest's amended complaint against the JENNIFER and Matthew, with prejudice;

(2) That in this action final judgment be entered dismissing the amended counterclaim of the JENNIFER and Matthew against Sucrest, with prejudice.